**Etoile LeBLANC, Stephen Ossen, Plaintiffs–Appellants,**

v.

**Terry CLEVELAND, Robert Grant, Jr., Defendants–Third–Party–Plaintiffs,**

**J.R.D. Retailers Ltd., d/b/a Syd and Dusty's Outfitters, Third–Party–Defendants–Appellees.**

**Docket No. 97–9389**

United States Court of Appeals, Second Circuit.

Argued: Feb. 11, 1999

Decided: Dec. 09, 1999

---

Paul S. Edelman, Kreindler & Kreindler, New York, NY, for Plaintiffs–Appellants.

E. David Duncan, Law Office of David Duncan, Albany, NY, for Third–Party–Defendants–Appellees.

Before: VAN GRAAFEILAND and PARKER, Circuit Judges, and MISHLER, District Judge.*

PARKER, Circuit Judge:

Etoile LeBlanc and Stephen Ossen appeal from an order of the United States District Court for the Northern District of New York (Lawrence E. Kahn, Judge), entered October 1, 1997, dismissing their claims for lack of subject matter jurisdiction. The district court based the dismissal on its conclusion that the portion of the Hudson River in which the accident giving rise to appellants' claims took place was not a navigable waterway for purposes of establishing federal admiralty jurisdiction.

We affirm.

## I. BACKGROUND

On July 4, 1994, Etoile LeBlanc and Stephen Ossen suffered personal injuries when the kayak they were paddling on the Hudson River was struck by a recreational motor boat operated by Terry Cleveland and owned by Robert Grant. LeBlanc and Ossen had rented their kayak from JRD Retailers, Ltd., d/b/a Syd & Dusty's Outfitters ("JRD"). The collision occurred approximately 29 miles upstream of Fort Edward, near Lake Luzerne.

On March 29, 1995, LeBlanc and Ossen sued Grant and Cleveland in the Southern District of New York, invoking federal admiralty jurisdiction. They alleged that Grant and Cleveland negligently caused the collision and their resulting injuries. On September 22, 1995, the action was transferred to the Northern District of New York. Cleveland and Grant then brought third-party complaints against JRD. Pursuant to Rule 14(c) of the Federal Rules of Civil Procedure, these third-party complaints allowed the case to proceed as if LeBlanc and Ossen had sued JRD as well as Cleveland and Grant. Fed. R.Civ.P. 14(c).

On July 22, 1997, JRD moved to dismiss the complaint filed by LeBlanc and Ossen for lack of subject matter jurisdiction. See Fed.R.Civ.P. 12(b)(1). On October 1, 1997, the district court granted the motion, finding that the Hudson River is not "navigable in fact" at the location at which the accident took place and that, consequently, the court lacked admiralty jurisdiction over the lawsuit. The court acknowledged that the Hudson River below Fort Edward is a navigable waterway because it permits passage to the open sea. Nonetheless, the court found that the "part of the Hudson [where the accident took place] cannot . . . be accessed from Fort Edward due to the presence of numerous areas of rapids, . . . [nine] dams, and at least three major waterfalls of 30 feet or more in height." As a result, the court concluded that "[n]othing in the records suggests that the Hudson north of Fort Edward is now, or has ever been, an artery of maritime commerce" sufficient to support a finding of navigability necessary to the exercise of federal admiralty jurisdiction. LeBlanc and Ossen timely appealed.

## II. DISCUSSION

On appeal, LeBlanc and Ossen argue that the district court erred in finding that the Hudson River is unnavigable north of Fort Edward for purposes of establishing federal admiralty jurisdiction. In support of this argument, they contend, first, that the district court applied an incorrect standard when it found that navigability was precluded in part due to the existence of artificial dams. Appellants urge this Court to adopt a standard that focuses on the historic navigability of the river in its natural, unimproved state, rather than its present, improved state. Second, they assert that, whether the test focuses on his-

---

* The Honorable Jacob Mishler, Senior Judge of the United States District Court for the East-
ern District of New York, sitting by designation.

toric or contemporary navigability, the Hudson is sufficiently navigable at the site of the accident to support federal admiralty jurisdiction over their claims. After setting forth the applicable standard of review, we address each argument in turn.

### A. Standard of Review

 Where the relevant facts are not in dispute, a district court considering a motion to dismiss for lack of admiralty jurisdiction must take as true all of the material factual allegations contained in the complaint. *See Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998). However, where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits. *See Filetech S.A. v. France Telecom S.A.,* 157 F.3d 922, 932 (2d Cir.1998). We review the district court's factual findings for clear error and its legal conclusions de novo. *See id.* at 930.

### B. The Proper Standard for Determining Navigability

 Appellants first contend that the district court applied an incorrect legal standard in finding admiralty jurisdiction lacking. Specifically, they argue for a jurisdictional test that focuses on the historic navigability of the waterway in question, without reference to present-day artificial obstructions, rather than on its contemporary navigability, including artificial dams. Under an historic navigability test, the argument continues, the district court erred in refusing to take into account the fact that, prior to 1951 and before the construction of several impassable dams, the logging industry regularly used the Hudson River upstream of Fort Edward to float logs to timber mills. For the reasons discussed below, appellants' argument fails.

 The Constitution extends federal judicial power "to all Cases of admiralty and maritime Jurisdiction." U.S. Const.

art. III, § 2. Congress has codified that power at 28 U.S.C. § 1333(1), which gives federal district courts "original jurisdiction ... of ... [a]ny civil case of admiralty or maritime jurisdiction...." *Id.; see also Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 531–32, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995). The primary purpose of federal admiralty jurisdiction is to "protect[ ] commercial shipping" with "uniform rules of conduct." *Sisson v. Ruby,* 497 U.S. 358, 362, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990)(internal quotations omitted).

 In light of this stated purpose, the Supreme Court has enunciated a two-part test for determining whether a tort action falls within the federal courts' admiralty jurisdiction. First, the alleged tort must have occurred on or over "navigable waters." *Grubart,* 513 U.S. at 534, 115 S.Ct. 1043. Second, the activity giving rise to the incident must have had a substantial relationship to traditional maritime activity such that the incident had a potentially disruptive influence on maritime commerce. *Id.* The Supreme Court has held that although pleasure boating is not itself maritime commerce, pleasure boat accidents have a significant relationship to traditional maritime activity because of "[t]he potential disruptive impact [upon maritime commerce] of a collision between boats on navigable waters." *Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 675, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982). In light of *Foremost,* the parties do not dispute that if the first part of the jurisdictional test is satisfied, the second is as well. Thus, appellants assign error only to the definition of "navigable waters" employed by the district court.

The district court, like virtually every other court to consider the question of navigability for admiralty jurisdiction purposes, applied the definition of navigable waters first articulated in *The Daniel Ball,* 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1870):

Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water.

*Id.* at 563; *see also Grubart*, 513 U.S. at 529–30, 115 S.Ct. 1043 (applying *The Daniel Ball* for purposes of determining admiralty jurisdiction); *In re Petition of Boyer*, 109 U.S. 629, 631–32, 3 S.Ct. 434, 27 L.Ed. 1056 (1884) (same). The district court found, and the parties did not dispute, that the Hudson River downstream of Fort Edward can be and is used as a continuous highway for interstate commerce because it permits passage beyond New York both to the south, where it empties into the Atlantic, and to the north, via the Champlain Canal (which begins near Fort Edward) and the St. Lawrence. However, the court found that the accident site is separated from Fort Edward, and therefore from any interstate or international waterway, by numerous impassable rapids, falls, and artificial dams.

Appellants do not dispute that *The Daniel Ball* sets forth the basic navigability test for purposes of admiralty jurisdiction. Instead, they first contend that by focusing on whether rivers are navigable "in their ordinary condition," the *Daniel Ball* test required the district court to measure navigability by reference to the river's historic, unimproved state, rather than its present, improved state.

■ This argument is foreclosed by subsequent Supreme Court caselaw. In *United States v. Appalachian Electric Power Co.*, 311 U.S. 377, 407, 61 S.Ct. 291, 85 L.Ed. 243 (1940), the Court found that "ordinary condition" as used in *The Daniel Ball* refers not to the absence of human interference with the course of the river, but "to volume of water, the gradients and the regularity of the flow" of the waterway. *Id.* at 407, 61 S.Ct. 291. Thus, under the *Daniel Ball* test, an otherwise unnavigable river may not be rendered navigable simply because, in extraordinary conditions, its waters rise high enough to support forms of transportation normally impossible. 1 Steven F. Friedell, *Benedict on Admiralty* § 142, at 9–6 (7th ed. 1998) ("It is not enough that a fishing skiff or gunning canoe can be made to float at high water ... or that logs, poles and rafts are floated down in high waters."). But nothing in *The Daniel Ball* indicates that an historically navigable river remains navigable for admiralty jurisdiction purposes when it is made impassable by an artificial obstruction.

Perhaps recognizing that their interpretation of *The Daniel Ball* lacks legal support, appellants next rely on *The Montello*, 87 U.S. (20 Wall.) 430, 22 L.Ed. 391 (1874), claiming that it "refined" the *Daniel Ball* test discussed above. In *The Montello*, the Supreme Court was called upon to determine whether Congress had the authority under the Commerce Clause to regulate steamships plying the waters of Wisconsin's Fox River. Congress's power to regulate activity on the Fox River turned on whether the river was navigable. Setting forth the standard of navigability applicable in this context, the Court wrote:

The capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of a river, rather than the extent and manner of that use. If it be capable in its natural state of being used for purposes of commerce, no matter in what mode the commerce may be con-

ducted, it is navigable in fact, and becomes in law a public river or highway. *Id.* at 441–42. Appellants contend that by referencing the "natural state" of the river in question, the *Montello* Court made clear that navigability should be judged without reference to artificial obstructions. Indeed, the Supreme Court has since specifically held that, for purposes of defining Congress's power to regulate under the *Commerce Clause,* an otherwise navigable river cannot be rendered unnavigable by the construction of artificial dams. *See, e.g., Economy Light & Power Co. v. United States,* 256 U.S. 113, 123, 41 S.Ct. 409, 65 L.Ed. 847 (1921).

Nonetheless, appellants' reliance on *The Montello* and its progeny is misplaced. As noted above, *The Montello* did not define navigable waters for purposes of establishing the limits of admiralty jurisdiction; instead, it defined navigable waters for the purpose of delimiting Congress's power to regulate under the Commerce Clause. The Supreme Court has recognized that the definition of navigable waters used in one context does not necessarily apply in another. *See Kaiser Aetna v. United States,* 444 U.S. 164, 170–72, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979). Rather, "any reliance upon judicial precedent must be predicated upon careful appraisal of the *purpose* for which the concept of 'navigability' was invoked in a particular case." *Id.* at 171, 100 S.Ct. 383 (internal quotations omitted).

Careful appraisal of the purposes for which the *Montello* Court invoked the concept of navigability reveals that the same definition should not be used to determine the limits of the federal judicial power under Article III or 28 U.S.C. § 1331(1). As the Ninth Circuit put it:

The definitions of navigability may vary because, as in the present case, the purposes served by the commerce clause and admiralty jurisdiction may vary. Congress' commerce power is designed in part to preserve and protect the nation's waterways which, in their natural condition, are navigable in interstate commerce. By virtue of this power, Congress may prevent or regulate obstruction of these waterways by the states through which they pass. The damming of a previously navigable waterway by a state cannot divest Congress of its control over a potentially useful artery of commerce, since such obstructions may always be removed. Hence the courts have reasonably held that a navigable river is not rendered non-navigable by artificial obstruction.

However, if the damming of a waterway has the practical effect of eliminating commercial maritime activity, no federal interest is served by the exercise of admiralty jurisdiction over the events transpiring on that body of water, whether or not it was originally navigable. No purpose is served by application of a uniform body of federal law, on waters devoid of trade and commerce, to regulate the activities and resolve the disputes of pleasure boaters. Only the burdening of federal courts and the frustrating of the purposes of state tort law would be thereby served.

*Adams v. Montana Power Co.,* 528 F.2d 437, 440–41 (9th Cir.1975) (citations omitted); *see also Chapman v. United States,* 575 F.2d 147, 149–50 (7th Cir.1978) (in banc) (quoting *Adams* ).

Recognizing the distinction between legislative authority under the Commerce Clause and admiralty jurisdiction, every circuit court to confront the question has rejected the historic navigability jurisdictional test when determining admiralty jurisdiction. In *Adams,* the Ninth Circuit held that a dam that prevented a waterway from being used as an artery of interstate commerce also prevented federal courts from exercising admiralty jurisdiction over a recreational boating accident that occurred on the waterway. *Adams,* 528 F.2d at 440–41. Similarly, in *Livingston v. United States,* 627 F.2d 165 (8th Cir.1980), the Eighth Circuit rejected a plaintiff's claim that because a river was navigable

before the construction of an impassable dam, it remained navigable for all time:

> [T]he closing of waters to commercial shipping should likewise have the effect of eliminating admiralty jurisdiction over them. In other words, the concept of "navigability" in admiralty is properly limited to describing a present capability of the waters to sustain commercial shipping.

*Id.* at 169–70 (footnote omitted); *see also Three Buoys Houseboat Vacations USA Ltd. v. Morts,* 921 F.2d 775, 778 (8th Cir. 1990) ("the standard is one of 'contemporary navigability in fact' "). And in *Chapman,* the Seventh Circuit held that, even if a dammed river was navigable for purposes of the Commerce Clause, it was not navigable for admiralty jurisdiction purposes where it was not susceptible of commercial navigation "in [its] present [dammed] state." *Chapman,* 575 F.2d at 151. Those cases in which circuit courts have found dammed waterways navigable for jurisdictional purposes are easily distinguished by the fact that the waterway in question formed the border between two states, thereby rendering it capable of supporting interstate commerce despite the existence of artificial dams blocking downstream flow. *See, e.g., Mullenix v. United States,* 984 F.2d 101, 103–04 & n. 3 (4th Cir.1993) (Potomac River navigable at point at which it forms the border of Maryland and West Virginia and supports ferry traffic between the two states); *Finneseth v. Carter,* 712 F.2d 1041, 1044 (6th Cir.1983) (lake navigable where it straddled the border of Tennessee and Kentucky).

As their final argument in favor of an historic navigability standard, appellants point us to *Adirondack League Club, Inc. v. Sierra Club,* 92 N.Y.2d 591, 684 N.Y.S.2d 168, 706 N.E.2d 1192 (1998). In *Adirondack League,* the New York Court of Appeals used an historic navigability standard for the purpose of identifying those "waterways [that] are of such practical utility that private ownership from the time of the original grant from the State or sovereign is subject to an easement for public travel." *Adirondack League,* 92 N.Y.2d at 601, 684 N.Y.S.2d at 170, 706 N.E.2d at 1194 (citation omitted). *Adirondack League,* of course, had nothing whatsoever to do with admiralty jurisdiction in the federal courts. Moreover, to state the purpose for which *Adirondack League* utilized the historic navigability standard is to distinguish it from the purpose admiralty jurisdiction serves. By its very nature, the process of determining which waterways are subject to public easements dating from a land grant by the State requires an historic navigability standard; under a contemporary navigability standard, the present-day owner of riparian rights could defeat a public easement merely by erecting an impassable obstacle in the waterway. This, of course, would defeat the purpose of the public easement doctrine. In contrast, and as discussed above, the purpose of federal admiralty jurisdiction is best served if the test for navigability is determined with reference to present-day artificial obstructions.

Thus, in light of the policies served by federal admiralty jurisdiction, we hold that a waterway at the situs in issue is navigable for jurisdictional purposes if it is presently used, or is presently capable of being used, as an interstate highway for commercial trade or travel in the customary modes of travel on water. Natural and artificial obstructions that effectively prohibit such commerce defeat admiralty jurisdiction.

C. *The District Court's Application of the Legal Standard*

■ Of course, under the contemporary navigability standard for purposes of determining admiralty jurisdiction, that we adopt today, it is immaterial that, prior to 1951 and before the construction of many of the nine dams, logs were floated down the Hudson near the accident site. Nonetheless, appellants contend that even

under the contemporary navigability standard, the district court had before it sufficient evidence of present-day navigability to support a finding of jurisdiction. But in the face of the district court's unchallenged factual findings, this argument necessarily fails.

As noted at the outset, the district court found that the Hudson River downstream of Fort Edward is capable of supporting interstate commerce. The court also found that "the presence of natural obstructions such as white water and falls as well as the presence of more recent man-made dams absolutely prevent continuous travel by any type of boat from the place of the accident to the waters below Fort Edward." Finally, the district court determined that the presence of dams between Fort Edward and the accident site would now impede any attempt to float timber on this stretch of the Hudson absent extraordinary river conditions. Appellants do not take issue with any of these findings on appeal.[1] Nor could they: Each enjoys substantial support in the record and is not clearly erroneous.

Instead, appellants contend only that the Hudson is navigable at the accident site because kayakers can portage around the dams separating the site from Fort Edward. But this argument lacks any legal support. Appellants cite, and we have found, no published decision holding that the possibility of recreational use assisted by multiple portages is, by itself, sufficient to render a waterway navigable for admiralty jurisdiction purposes. Navigability requires that the body of water be capable of supporting *commercial* maritime activity. It is irrelevant that the body of water is capable of supporting non-commercial maritime activity. "A waterway is navigable provided that it is used or susceptible of being used as an artery of commerce. Neither non-commercial fishing nor pleasure boating ... constitutes

commerce. Commerce for the purpose of admiralty jurisdiction means activities related to shipping." *Adams,* 528 F.2d at 437; *see also Foremost,* 457 U.S. at 675, 102 S.Ct. 2654 (pleasure boating is "non-commercial maritime activity"). The possibility that the waterway is capable of supporting non-commercial maritime activity of the type suggested by appellants does not render the waterway capable of supporting "commercial trade or travel in the customary modes of travel on water," as our holding today requires. As a result, the court did not err in finding that it lacked jurisdiction over appellants' claims.

## III. CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

---

1. Nor do appellants contend that the district court erred in making these findings without the benefit of an evidentiary hearing.