08-4566-cv
Vasquez v. FCE Industries, Ltd.

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2009

(Argued: August 26, 2009      Decided: September 15, 2009)

Docket No. 08-4566-cv

- - - - - - - - - - - - - - - - - - - -x

CIRA BAUTISTA VASQUEZ, individually, on
behalf of VICTOR ARTURO MEDINA BAUTISTA,
a minor and as Representative of the
Estate of GUMERSINDO MEDINA DUARTE,
deceased, also known as ARTURO MEDINA
DUARTE,

           Plaintiff-Appellant,

       - v.-

GMD SHIPYARD CORP.,

           Defendant-Cross-Claimant-
           Cross-Defendant-Appellee.

ALLIED TRANSPORTATION LLC, as Owner and
Operator of T/B ATC 23,

           Defendant-Cross-Claimant-
           Cross-Defendant,

FCE Industries, Ltd.,

           Defendant-Cross-Defendant.

- - - - - - - - - - - - - - - - - - - -x

Before: JACOBS, Chief Judge, NEWMAN, Circuit Judge, and Trager, District Judge.[*]

Appeal from a judgment entered after a bench trial in the United States District Court for the Eastern District of New York (Block, J.). A welder fell to his death while ascending the wall of a tank aboard a vessel in dry dock at the Brooklyn Navy Yard. The estate and family sued the general contractor, asserting claims under, inter alia, New York's "Scaffold Law," N.Y. Labor Law § 240(1). The district court found that the decedent, in order to let a co-worker descend the same ladder the decedent was using to ascend, had stepped off the ladder, and began climbing up the "angle irons." The court dismissed all claims, concluding that the general contractor was not negligent, and was not liable for failing to provide appropriate safety equipment. We affirm the judgment, and publish this opinion chiefly to clarify that the district court had federal maritime jurisdiction.

---

[*] The Honorable David G. Trager, United States District Court for the Eastern District of New York, sitting by designation.

WENDY FLEISHMAN, Lieff, Cabraser, Heimann & Bernstein LLP, New York, NY, <u>for Appellant</u>.

JOSEPH E. DONAT (John F. Gaffney, <u>on the brief</u>) Herzfeld & Rubin, P.C., <u>for Appellee</u>.

Dennis Jacobs, <u>Chief Judge</u>:

Decedent Gumersindo Medina Duarte ("Medina") died in a tragic accident while working aboard the Tank Barge ATC 23 on January 23, 2007. The vessel was in a "graving dock," a species of dry dock, at the Brooklyn Navy Yard. Medina, who was working on the floor of a tank, needed to get to the upper deck to adjust the regulator for his torch, and began climbing a ladder affixed to the tank wall. It is undisputed that, immediately prior to his fall, he stepped off the ladder in order to let a co-worker descend.

Medina's estate, wife, and child (all represented by his wife)[2] brought suit in the United States District Court for the Eastern District of New York (Block, <u>J.</u>) against the general contractor overseeing repairs to the barge, GMD

---

[2] Because Medina's estate and his child are represented by his wife, the parties refer to "plaintiff" in the singular. For ease of reference, this opinion does the same.

Shipyard Corp. ("GMD").[3] After a bench trial, the court entered judgment on behalf of GMD on all claims.

# BACKGROUND

The owner of Tank Barge ATC 23 contracted with defendant GMD to refit it so it could transport a particular kind of oil. GMD's subcontractor employed Medina as a part time welder.

On the morning of the accident, Medina was welding coils and refit pipes on the floor of the No. 2 starboard tank. To get to the deck, Medina had to climb two ladders, each approximately twenty feet long. The first runs from the base of the tank to a small platform, the second from the platform to the deck. The wall of the tank is reinforced by "angle irons," lateral projecting fins spaced at regular intervals of two-and-a-half feet from top to bottom. Each angle iron protrudes between five to eight

---

[3] Plaintiff also sued the owner of the ship, Allied Transportation LLC, and another company, FCE Industries, Ltd. Plaintiff settled with Allied Transportation, and FCE Industries never answered the complaint. According to GMD and Allied Transportation, FCE Industries is no longer in existence. See Vasquez v. FCE Indus. Ltd., No. 07 cv 1121(FB), 2008 WL 4224396, at *1 n.1 (E.D.N.Y. Sept. 10, 2008).

inches from the wall.  See Vasquez v. FCE Indus. Ltd., No. 07 cv 1121(FB), 2008 WL 4224396, at *1 (E.D.N.Y. Sept. 10, 2008).

Medina began ascending the first ladder while a co-worker, Mario Concepcion, was descending from the platform. Medina and Concepcion met approximately six to eight feet from the bottom of the tank.  To let Concepcion pass, Medina stepped off the ladder onto an angle iron.

The precise sequence of subsequent events is disputed. At a bench trial, the district court found the facts to be as follows:

> Rather than return to the tank floor and wait for Concepcion to finish descending, Medina moved laterally off the ladder and stepped onto one of the angle irons that provided structural support to the tank wall.  Then, instead of waiting for Concepcion to pass him and then returning to the ladder, Medina began climbing up the tank wall itself by means of the angle irons.  Moments after passing Concepcion, Medina lost his grip and fell from the angle irons to the floor of the tank [and died].

2008 WL 4224396, at *2.

Plaintiff does not dispute that Medina moved off the ladder, but maintains that there was insufficient evidence for the court to conclude that Medina actually "began

5

climbing up" the angle irons.

On the basis of its factual finding, the district court dismissed all plaintiff's causes of action, holding, <u>inter alia</u>, that Medina's injury was not caused by a dangerous condition on the premises (Labor Law § 200); that GMD was not required to provide additional safety devices under New York's Scaffold Law (Labor Law § 240(1)); and that the New York Industrial Code provision regarding "hazardous openings" (Labor Law § 241(6)) was inapplicable.

**DISCUSSION**

In reviewing a judgment entered after a bench trial, we are to "give due regard to the trial court's opportunity to judge the witnesses' credibility," and we "must not . . . set aside" findings of fact "unless [they are] clearly erroneous." Fed. R. Civ. P. 52(a)(6); <u>see also</u> <u>Anderson v. Bessemer City</u>, 470 U.S. 564, 573-74 (1985). "Under this standard, factual findings by the district court will not be upset unless we are 'left with the definite and firm conviction that a mistake has been committed.'" <u>FDIC v. Providence College</u>, 115 F.3d 136, 140 (2d Cir. 1997) (quoting <u>United States v. U.S. Gypsum Co.</u>, 333 U.S. 364, 395

6

(1948)). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson, 470 U.S. at 574. We review conclusions of law, and the application of the law to the facts, de novo. See, e.g., Henry v. Champlain Enters., Inc., 445 F.3d 610, 617-18, 623 (2d Cir. 2006).

## I

Although the parties do not contest our jurisdiction, we are obliged to ascertain it independently. See, e.g., Joseph v. Leavitt, 465 F.3d 87, 89 (2d Cir. 2006) ("[W]e have an independent obligation to consider the presence or absence of subject matter jurisdiction sua sponte.").

The Constitution extends federal judicial power "to all Cases of admiralty and maritime Jurisdiction." U.S. Const. art. III, § 2. Congress has codified admiralty and maritime jurisdiction at 28 U.S.C. § 1333(1), which gives federal district courts "original jurisdiction . . . of . . . [a]ny civil case of admiralty or maritime jurisdiction . . . ." Id.; see also Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 531-32 (1995); LeBlanc v. Cleveland, 198 F.3d 353, 356 (2d Cir. 1999). "The primary purpose of federal admiralty jurisdiction is to 'protect[ ]

7

commercial shipping' with 'uniform rules of conduct.'" LeBlanc, 198 F.3d at 356 (quoting Sisson v. Ruby, 497 U.S. 358, 362 (1990) (internal quotations omitted)).

Historically, admiralty jurisdiction over torts depended solely upon the locality of the wrong--"[i]f the wrong occurred on navigable waters, the action [was] within admiralty jurisdiction; if the wrong occurred on land, it [was] not." Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 253 (1972). In Executive Jet, the Supreme Court modified this "purely mechanical application of the locality test," and held that "the wrong [must also] bear a significant relationship to traditional maritime activity"--the nexus test. Id. at 261, 268.

Thus, we now apply a two-part test for determining when a tort action falls within the federal courts' admiralty jurisdiction. First, the alleged tort must have occurred on or over "navigable waters." Grubart, 513 U.S. at 534. Second, the activity giving rise to the incident must have had a substantial relationship to traditional maritime activity, such that the incident had a potentially disruptive influence on maritime commerce. Id.

**A. Navigable Waters**

Medina's fall occurred while the ATC 23 was being repaired in a "graving dock." A graving dock is "a permanent structure on land with gates that allow[s] vessels to enter and that then can be closed to drain out the water. In other words it is a dry drydock." San Francisco Drydock, Inc. v. Dalton, 131 F.3d 776, 777 (9th Cir. 1997); see also J.M.L. Trading Corp. v. Marine Salvage Corp., 501 F. Supp. 323, 326 n.2 (E.D.N.Y. 1980) ("A graving dock looks like a huge, concrete bathtub sunk into the ground . . . . When repairs are completed, workers flood the dock until the water reaches the same level as the water outside the gate. It is opened and the ship leaves."). There are three types of dry docks: "(1) A floating dry dock, as its name makes clear, floats on the water, the vessel resting on the bottom of the dry dock after the water has been removed. (2) A graven dry dock is dug into the land. The vessel floats in but rests on land once the water has been pumped out. (3) Finally there is the marine railway, on which the vessel is drawn out of the water, instead of the water being drawn away from the vessel." Avondale Marine Ways v. Henderson, 346 U.S. 366, 367 (1953) (Burton, J., concurring).

The water in a graving (or graven) dock is temporarily

9

removed so that a ship under repair comes to rest on dry land, but the temporary absence of water does not defeat federal maritime jurisdiction.  In The Robert W. Parsons, 191 U.S. 17, 33-34 (1903), the Supreme Court held that a vessel in a "graven dock" remains in navigable waters for purposes of admiralty jurisdiction, even when the water is removed: "as all serious repairs upon the hulls of vessels are made in drydock, the proposition that such repairs are made on land would practically deprive the admiralty courts of their largest and most important jurisdiction in connection with repairs.  No authorities are cited for this proposition, and it is believed that none such exist."  Id.

The Supreme Court reaffirmed the point in Simmons v. The Steamship Jefferson, in which it compared a ship in a graven dock to one at a pier when the water temporarily recedes at low tide:

> In reason, we think it cannot be held
> that a ship or vessel employed in
> navigation and commerce is any the less a
> maritime subject within the admiralty
> jurisdiction when, for the purpose of
> making necessary repairs to fit her for
> continuance in navigation, she is placed
> in a dry dock and the water removed from
> about her, than would be such a vessel if
> fastened to a wharf in a dry harbor,
> where, by the natural recession of the
> water by the ebbing of the tide, she for

a time might be upon dry land.

215 U.S. 130, 142 (1909).  See also In re Paradise Holdings, Inc., 795 F.2d 756 (9th Cir. 1986) (admiralty jurisdiction extends to shallow, non-navigable waters that are within the ebb and flow of the tide); Hassinger v. Tideland Elec. Membership Corp., 781 F.2d 1022, 1026 (4th Cir. 1986) ("Admiralty jurisdiction in America therefore extends to all areas within the ebb and flow of the tide, regardless of whether those areas are actually covered by water at the time of the alleged event."); but see McElheney v. Workers' Comp. Appeal Bd., 940 A.2d 351, 359, 596 Pa. 48, 60 (Pa. 2008).

We have no reason to question the currency of The Robert W. Parsons and The Steampship Jefferson.  These cases "may be old, but they are old precedent, and we are bound to follow them."  Sea Vessel, Inc. v. Reyes, 23 F.3d 345, 348–49 (11th Cir. 1994).  In Sea Vessel, for instance, the Eleventh Circuit found "no authority that would compel this court to question the[ir] continued vitality," and concluded that a ship in a dry dock is "in or on navigable waters for purposes of admiralty jurisdiction."  Id.  As the Eleventh Circuit concluded: Supreme Court precedent, common practice,

and logic all compel the conclusion that a ship in a "graving" or "graven" dock is still in "navigable waters" for purposes of federal admiralty jurisdiction even though water may have been temporarily removed.

**B. Nexus to Traditional Maritime Activity**

The next question is whether the refitting of a ship in dry dock has a substantial relationship to traditional maritime activity. In answering this question, "[a] court, first, must assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce. Second, a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." Grubart, 513 U.S. at 534 (internal quotations and citations omitted); see also Sisson, 497 U.S. at 364.

The first assessment looks to "potential effects, not to the particular facts of the incident, . . . whether the general features of the incident [a]re likely to disrupt commercial activity." Grubart, 513 U.S. at 538 (internal quotations and citations omitted.) We consider a "description of the incident at an intermediate level of

12

possible generality." Id. In this case, there is little question that this kind of accident--the death of persons repairing and refitting a vessel--has a potentially disruptive effect on maritime commerce.

The second assessment looks to "whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." Grubart, 513 U.S. at 539. The "general features" of an activity are ascertained by the "general conduct from which the incident arose." Sisson, 497 U.S. at 364. "General conduct" is not particular conduct. In Sisson, for example, suit arose from a fire aboard a pleasure yacht while it was docked at a marina. The "general conduct" was held to be the "storage and maintenance" of vessels at marinas: "We need not ascertain the precise cause of the fire to determine what 'activity' [the boat owner] was engaged in, rather, the relevant activity was the storage and maintenance of a vessel at a marina on navigable waters." Sisson, 497 U.S. at 365. At that level of generality, the general conduct of storing and maintaining vessels was clearly a "common, if not indispensable, maritime activity." Sisson, 497 U.S. at 367.

13

As in Sisson, the general conduct in this case is the repair and maintenance of a vessel, just as obviously an "indispensable" and "traditional" maritime activity.

Therefore, we conclude that the activity giving rise to the incident had a substantial relationship to traditional maritime activity such that the incident had a potentially disruptive influence on maritime commerce. The district court had maritime jurisdiction.

                                II

On appeal, plaintiff challenges four aspects of the district court's judgment.

**A. Fact-Finding.** Plaintiff challenges the finding that the accident occurred when Medina "began climbing up" the angle irons.

Both the eye-witnesses gave trial testimony that conflicted with their prior statements. Martin Fernandez had earlier said that Medina fell when he began climbing the angle irons; but at trial, Fernandez said that Medina fell from the angle irons, but that Medina had never attempted to climb them. Mario Concepcion, who was climbing down the ladder while Medina was climbing up, signed an earlier statement to the effect that Medina fell from the angle

14

irons; but at trial, he said he was unsure exactly how Medina fell or where Medina fell from. Plaintiff argues that these witnesses' prior statements were hearsay, only admissible for impeachment, and the court improperly relied on them for the truth of the matter asserted. See Santos v. Murdock, 243 F.3d 681, 684 (2d Cir. 2001).

But even excluding the earlier statements given by Fernandez and Concepcion, the evidence was confused as to exactly where Medina was standing, how he fell, or whether he in fact was attempting to climb up the angle irons. In light of this uncertainty, we disregard the district court's finding that Medina began climbing up the tank wall right before he fell and instead rely on the fully supported, implicit finding that Medina fell after he stepped off the ladder on to an angle iron, whether or not he was ascending the tank wall by means of the angle irons.

**B. Labor Law § 200 (common law negligence).** The common law negligence claim, under Labor Law § 200, was dismissed on grounds that no GMD employee directly supervised or controlled the manner of Medina's work, and that Medina's injury was not caused by a "dangerous condition" on the

15

premises.[4]

Section 200 requires owners and general contractors on construction sites (including barges and docks[5]) "to provide reasonable and adequate protection . . . to the persons employed therein or lawfully frequenting such places." N.Y. Lab. Law § 200(1). But it does not require "an owner to secure the safety of his servant against a condition, or even defects, risks or dangers that may be readily observed by the reasonable use of the senses, having in view the age,

---

[4] Since Medina was injured in navigable waters, maritime law governs his claims. See Becker v. Poling Transp. Corp., 356 F.3d 381, 388 (2d Cir. 2004). But, "federal maritime law incorporates common law negligence principles generally, and New York law in particular." Id. (citing Int'l Ore & Fertilizer Corp. v. SGS Control Servs., Inc., 38 F.3d 1279, 1284 (2d Cir. 1994)). With respect to maritime torts, a "State may modify or supplement the maritime law by creating liability which a court of admiralty will recognize and enforce when the state action is not hostile to the characteristic features of the maritime law or inconsistent with federal legislation." Just v. Chambers, 312 U.S. 383, 388 (1941). Here, neither party contends that the New York statutes in question are hostile to the characteristic features of the maritime law, or inconsistent with federal legislation. Hence we assume, without deciding, that the relevant New York Labor Law provisions apply.

[5] Barges and docks may be deemed construction sites for the purposes of Labor Law § 200. See O'Hara v. Weeks Marine, Inc., 294 F.3d 55, 68 n.8 (2d Cir. 2002) (citing Cammon v. City of New York, 95 N.Y.2d 583, 590, 744 N.E.2d 114, 119 (2000) and Rigopoulos v. State, 236 A.D.2d 459, 460, 653 N.Y.S.2d 667, 699 (2d Dep't 1997)).

16

intelligence and experience of the servant." Gasper v. Ford Motor Co., 13 N.Y.2d 104, 110, 205 N.E.2d 163 (1963) (internal quotations omitted); see also Russin v. Louis N. Picciano & Son, 54 N.Y.2d 311, 316-17, 429 N.E.2d 805, 807 (1981) ("Section 200 of the Labor Law merely codified the common-law duty imposed upon an owner or general contractor to provide construction site workmen with a safe place to work."). Owners and general contractors may be liable under § 200 if they "supervised or controlled the work performed or had actual or constructive notice of the unsafe condition which precipitated plaintiff's injury." Bailey v. Irish Dev. Corp., 274 A.D.2d 917, 921, 711 N.Y.S.2d 241, 245 (3d Dep't 2000).

The record evidence supports the district court's rulings [i] that GMD did not supervise or control the way Medina climbed the ladder, and [ii] that the ladder was not in itself a "dangerous condition." Vasquez, 2008 WL 4224396, at *4-6.

Under the "supervision or control" wording of § 200, liability attaches only where the general contractor "controlled the manner in which the plaintiff performed his or her work, i.e., how the injury-producing work was

17

performed." Hughes v. Tishman Constr. Corp., 40 A.D.3d 305, 306, 836 N.Y.S.2d 86, 89 (1st Dep't 2007) (emphasis omitted). There is no evidence that GMD (or other entities) supervised Medina's ascent up the ladder.[6] As to whether the ladder was a dangerous condition, plaintiff failed to show that the ladder was defective. See Mollano v. RC Dolner Constr. Co., No. 11010/06, 2008 WL 787262 (N.Y.Sup.Ct. Feb. 20, 2008) ("In this case the ladder was clearly visible and by the reasonable use of one's senses was an obvious condition. Moreover, . . . such ladder was [not] defective in any way. Thus, the ladder was not a dangerous condition as a matter of law." (citation omitted)). In any event, the accident happened only after Medina left the ladder for the dangerous footing of the angle irons.

**C. Scaffold law.** Plaintiff challenges the dismissal of her claim under New York's "Scaffold Law," Labor Law §

---

[6] Plaintiff's contention that GMD regularly inspected the tank to confirm whether the ladders were serviceable is beside the point. An inspection would not reveal that the ladder was being used, or misused, as it was by decedent. And, even if Martin Fernandez testified that it was common practice for the workers in the tank to stand on the angle irons, plaintiff concedes that GMD's safety director "never observed multiple men traveling up and down the ladders." Appellants Br. at 10.

18

240(1), arguing that Medina was never trained on how to use the ladder, or that he should have been provided with alternative safety equipment (such as a harness).

New York's "Scaffold Law," provides absolute liability to owners and general contractors for failing to provide adequate safety equipment in the face of elevation risks:

> All contractors and owners and their agents, . . . in the . . . repairing, altering, painting, cleaning or pointing of a building or structure shall furnish . . . for the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed.

N.Y. Labor Law § 240(1) (McKinney 2009). Liability under § 240(1) is limited to accidents related to the inherent effects of gravity. Rocovich v. Consol. Edison Co., 78 N.Y.2d 509, 513, 583 N.E.2d 932, 934 (1991). Although liability is absolute, the plaintiff has the burden of showing causation. See Blake v. Neighborhood Hous. Servs. of N.Y. City, Inc., 1 N.Y.3d 280, 287-89, 803 N.E.2d 757, 760-63 (2003) (stating that "the phrase 'strict (or absolute) liability' in the Labor Law § 240(1) context is different from the use of the term elsewhere" and explaining

19

that section 240(1) requires proof of causation); <u>Artoglou v. Gene Scappy Realty Corp.</u>, 57 A.D.3d 460, 461, 869 N.Y.S.2d 172, 175 (2d Dep't 2008) ("the defect, or the failure to secure the ladder, was a substantial factor in causing the plaintiff's injuries.").

We agree with the district court that, even assuming that the defendant had failed to provide an adequate safety device, plaintiff has not carried her burden of showing that Medina's injury was caused by any such inadequacy. Medina himself deliberately stepped off the ladder onto the angle irons, thus abandoning the device that was provided for his safety. <u>See</u> <u>Meade v. Rock-McGraw, Inc.</u>, 307 A.D.2d 156, 159, 760 N.Y.S.2d 39, 42 (1st Dep't 2003) ("That the ladder was inadequately secured was due to plaintiff's improper use of it, which would not give rise to a Labor Law violation.").

**D. Labor Law § 241(6).** Finally, plaintiff challenges the dismissal of her claim under Labor Law § 241(6). To state a claim under Labor Law § 241(6), a plaintiff must allege a violation of the New York Industrial Code. <u>See</u> <u>Ross v. Curtis-Palmer Hydro-Electric Co.</u>, 81 N.Y.2d 494, 501-02, 618 N.E.2d 82 (1993); <u>Misicki v. Caradonna</u>, 12

N.Y.3d 511, --N.E.2d-- (2009).  The Code violation, moreover, must be grounded upon a breach of a "specific, positive command," rather than a "reiteration of common-law standards."  Id., 81 N.Y.2d at 504.  Here, plaintiff alleged a violation of 12 N.Y.C.R.R. § 23-1.7(b)(1), which addresses "hazardous opening[s] into which a person may step or fall."  The regulation requires that such hazardous openings be "guarded by a substantial cover fastened in place or by a safety railing . . . ."  12 N.Y.C.R.R. § 23-1.7(b)(1)(i).  If workers are required to work near the edge of such an opening, they must be protected by life nets, safety belts, or planking.  12 N.Y.C.R.R. § 23-1.7(b)(1)(iii).

We agree with the district court that 12 N.Y.C.R.R. § 23-1.7(b)(1) is inapplicable to the facts of this case.  See 2008 WL 4224396, at *10.  Ample New York authority holds that § 23-1.7 does not apply to falls from ladders or staircases.  See, e.g., Smith v. McClier Corp., 38 A.D.3d 322, 323, 831 N.Y.S.2d 413, 414 (1st Dep't 2007) ("a staircase is not considered a 'hazardous opening'"); Riccio v. NHT Owners, LLC, No. 32163/04, 2006 WL 2689702, at *1, *8 (Sup. Ct. Kings County Aug. 23, 2006) (holding that where plaintiff "fell from near the top of an A-frame, fiberglass

21

ladder" in an elevator pit, "accident did not involve a fall into a hazardous opening").

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.