[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-12597

_____

D.C. Docket No. 1:14-cv-23850-CMA

YOURY TUNDIDOR,

Plaintiff-Appellant,

versus

MIAMI-DADE COUNTY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 3, 2016)

Before WILLIAM PRYOR and JILL PRYOR, Circuit Judges, and VOORHEES,[*]
District Judge.

WILLIAM PRYOR, Circuit Judge:

---

[*] Honorable Richard L. Voorhees, United States District Judge for the Western District of North
Carolina, sitting by designation.

The appeal requires us to decide whether a canal is navigable for purposes of admiralty jurisdiction, 28 U.S.C. § 1333, if an artificial obstruction prevents vessels from using the canal to conduct interstate commerce. Youry Tundidor suffered injuries while aboard a vessel traveling in the Coral Park Canal, a drainage canal in Miami-Dade County. Tundidor sued the County for negligence, but the district court dismissed his complaint for lack of subject-matter jurisdiction. Admiralty jurisdiction extends only to waters that are navigable in interstate commerce. Because an artificial obstruction prevents vessels from traveling from the Coral Park Canal to places outside of Florida, we agree with the district court that Tundidor's injuries did not occur on navigable waters for purposes of admiralty jurisdiction. We affirm.

## I. BACKGROUND

In July 2013, Tundidor suffered serious injuries while he was a passenger on a pleasure boat traveling south on the Coral Park Canal. As the boat approached the Coral Park Canal Bridge, near SW 94th Avenue and SW 12th Street, the four passengers lowered their heads, and the vessel passed under the bridge. As the boat emerged on the south side of the bridge, Tundidor raised his head and hit a water pipe. The force of the impact ejected Tundidor from the boat and into the canal.

The Coral Park Canal is a drainage canal located in southwest Miami-Dade County. It joins the Tamiami (or C-4) Canal at the intersection of SW 94th Avenue

2

and SW 8th Street, which forms a low-lying bridge over the canal at the intersection. The Tamiami Canal extends eastward past the Miami International Airport and connects to the Miami River. The Miami River leads to the Biscayne Bay and the Atlantic Ocean.

Along the Tamiami Canal, between the Coral Park Canal and the Miami River, a series of low-lying bridges, water pipes, and railroad tracks partially obstruct the waterway. None of the bridges are bascule bridges, which can open to allow vessels to pass. Many of these bridges are supported by submerged structural columns, narrowing the area a vessel has to pass.

After this series of obstructions, toward the eastern end of the Tamiami Canal sits a water control structure labeled S-25B, which prevents overdrainage and saltwater intrusion. The structure has mechanical gates that open only underwater. The structure prevents navigation from the western side of the water control structure to the Miami River. A sign next to the structure states, "DANGER — NO BOATING BEYOND THIS POINT."

Tundidor sued Miami-Dade County, the owner and operator of the main water line, in the district court for negligence. He invoked federal admiralty jurisdiction on the ground that the accident occurred on a navigable waterway. The County moved to dismiss the suit for lack of subject-matter jurisdiction. The County raised a factual challenge to jurisdiction; that is, the County argued that the

3

Coral Park Canal does not have a navigable connection to the Miami River, the Biscayne Bay, or the Atlantic Ocean. The district court granted the motion to dismiss.

## II. STANDARD OF REVIEW

On a motion to dismiss for lack of subject-matter jurisdiction, "[w]e review the district court's legal conclusions *de novo* and its factual findings for clear error." *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009).

## III. DISCUSSION

Federal district courts have "original jurisdiction, exclusive of the courts of the States, of . . . [a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1). In a tort case, a complaint must satisfy two elements to invoke admiralty jurisdiction: "(1) there must be a significant relationship between the alleged wrong and traditional maritime activity (the nexus requirement) and (2) the tort must have occurred on navigable waters (the location requirement)." *Aqua Log, Inc. v. Lost & Abandoned Pre-Cut Logs & Rafts of Logs*, 709 F.3d 1055, 1059 (11th Cir. 2013). The County contends that Tundidor's complaint fails to satisfy the location requirement.

4

The Supreme Court of the United States long ago defined "navigable waters" in *The Daniel Ball*, 77 U.S. (10 Wall.) 557 (1870), as waters that are capable for use in commerce:

> Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water.

*Id.* at 563. As a leading treatise explains, the test of navigability for purposes of admiralty jurisdiction has two requirements: the waters must be navigable in fact and have an "interstate nexus." *See* 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 3-3 (5th ed. 2015).

In *Aqua Log*, we rejected the proposition that "admiralty jurisdiction should extend only to those waterways with present or planned commercial activity." 709 F.3d at 1059. We held that "a waterway is navigable for admiralty-jurisdiction purposes if, in its present state, it is capable of supporting commercial activity." *Id.* at 1056. But we did not decide whether a waterway with artificial obstructions that prevent commerce can satisfy this test.

5

Although the Miami River is a navigable waterway, *see Sea Vessel, Inc. v. Reyes*, 23 F.3d 345, 346 n.1 (11th Cir. 1994), the Coral Park Canal is not navigable because the S-25B water control structure prevents vessels on the canal from traveling outside the State of Florida. The Supreme Court has stated that "[i]n determining the boundaries of admiralty jurisdiction, we look to the purpose of the grant." *Exxon Corp. v. Cent. Gulf Lines, Inc.*, 500 U.S. 603, 608 (1991). "A body of water that is confined within a state and does not form part of an interstate waterway is not an admiralty concern." *Alford v. Appalachian Power Co.*, 951 F.2d 30, 32 (4th Cir. 1991) (citing *The Robert W. Parsons*, 191 U.S. 17, 26 (1903)). The S-25B water control structure obstructs the commercial highway. Because the Coral Park Canal cannot support interstate commerce, it cannot satisfy the location requirement of admiralty jurisdiction.

Every circuit court to consider the issue has ruled that when artificial obstructions on a waterway block interstate commercial travel, the waterway cannot support admiralty jurisdiction. *See LeBlanc v. Cleveland*, 198 F.3d 353, 359 (2d Cir. 1999); *Alford*, 951 F.2d at 33–34 (4th Cir.); *Livingston v. United States*, 627 F.2d 165, 169–70 (8th Cir. 1980); *Chapman v. United States*, 575 F.2d 147, 149–51 (7th Cir. 1978); *Adams v. Montana Power Co.*, 528 F.2d 437, 440–41 (9th Cir. 1975). For example, in *Adams*, the Ninth Circuit held that a 25-mile stretch of the Missouri River in Montana enclosed on both sides by dams was not a navigable

6

water. 528 F.2d at 439. The Ninth Circuit reasoned that "if the damming of a water-way has the practical effect of eliminating commercial maritime activity, no federal interest is served by the exercise of admiralty jurisdiction over the events transpiring on that body of water, whether or not it was originally navigable." *Id.* at 440. We agree with that reasoning.

Tundidor argues that the test for navigable waters is one of historical navigability. He argues that the Coral Park Canal is navigable because it has a navigable connection to the Tamiami Canal, which historically served as a navigable waterway supporting commercial activity. Tundidor misunderstands the controlling precedents.

Tundidor argues that the use of the term "ordinary condition" in *The Daniel Ball*, 77 U.S. (10 Wall.) at 563, establishes a test of historical navigability, but the Supreme Court later explained that "'[n]atural or ordinary conditions' refers to volume of water, the gradients and the regularity of the flow," *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 407 (1940) (footnote omitted) (quoting *United States v. Oregon*, 295 U.S. 1 (1935)). As the Second Circuit has explained, "[U]nder the *Daniel Ball* test, an otherwise unnavigable river may not be rendered navigable simply because, in extraordinary conditions, its waters rise high enough to support forms of transportation normally impossible." *LeBlanc*, 198 F.3d at 357. *The Daniel Ball* did not address whether a body of water "remains

7

navigable for admiralty jurisdiction purposes when it is made impassable by an artificial obstruction." *Id.*

Tundidor also argues that we adopted a test of historical navigability in *Aqua Log* because we noted that "[h]istorically, commercial vessels used both the Flint River and Spring Creek for transportation," 709 F.3d at 1057, but the parties in *Aqua Log* agreed that the Flint River and Spring Creek were, at the time of our decision, capable of transporting commercial vessels. *Id.* Based on the parties' concession, we had no opportunity to adopt a test of historical navigability.

Tundidor cites several other decisions that purportedly apply or endorse a test of historical navigability, but these decisions do not involve admiralty jurisdiction. Tundidor cites decisions about the power of Congress under the Commerce Clause, *see The Montello*, 87 U.S. 430 (1874); the statutory authority of the Army Corps of Engineers, *see Miami Valley Conservancy Dist. v. Alexander*, 692 F.2d 447 (6th Cir. 1982); the statutory authority of the Federal Energy Regulatory Commission, *see Consol. Hydro, Inc. v. FERC*, 968 F.2d 1258 (D.C. Cir. 1992); and the public ownership of submerged lands, *see United States v. Holt State Bank*, 270 U.S. 49 (1926). To be sure, the term "navigable waters" is relevant in several different areas of the law: it is used to define the scope of the power of Congress under the Interstate Commerce Clause, *see South Carolina v. Georgia*, 93 U.S. 4 (1876); to define regulatory jurisdiction under several federal statutes,

8

*see, e.g.*, *United States v. Republic Steel Corp.*, 362 U.S. 482 (1960); to circumscribe state ownership of submerged lands, *see Utah v. United States*, 403 U.S. 9 (1971); and to identify a navigational servitude, *see Kaiser Aetna v. United States*, 444 U.S. 164 (1979). But "the test for navigability is not applied in the same way in these distinct types of cases." *PPL Mont., LLC v. Montana,* 132 S. Ct. 1215, 1228 (2012). Specifically, "the expansive definitions of navigability developed in commerce clause cases are not really appropriate in other contexts where the actual capability of a stream to support navigation is critical." *Livingston*, 627 F.2d at 169; *see also Kaiser Aetna*, 444 U.S. at 173 ("Reference to the navigability of a waterway adds little if anything to the breadth of Congress' regulatory power over interstate commerce."). The Supreme Court has explained that "any reliance upon judicial precedent must be predicated upon careful appraisal of the *purpose* for which the concept of 'navigability' was invoked in a particular case." *Kaiser Aetna*, 444 U.S. at 171 (quoting *United States v. Kaiser Aetna*, 408 F. Supp. 42, 49 (D. Haw. 1976)).

The "indelible navigability" doctrine—the principle that once a waterway becomes a navigable water of the United States, it remains a navigable water of the United States—makes sense in other contexts. For instance, "Congress' commerce power is designed in part to preserve and protect the nation's waterways which, in their natural condition, are navigable in interstate commerce." *Adams*, 528 F.2d at

9

440. "The damming of a previously navigable waterway by a state cannot divest Congress of its control over a potentially useful artery of commerce, since such obstructions may always be removed." *Id*. And a test of historical navigability promotes the purpose of the doctrine of navigational servitude: "[U]nder a contemporary navigability standard, the present-day owner of riparian rights could defeat a public easement merely by erecting an impassable obstacle in the waterway." *LeBlanc*, 198 F.3d at 359.

In contrast with those other areas of the law, extending jurisdiction to waters incapable of commercial activity serves no purpose of admiralty jurisdiction. "The purpose behind the grant of admiralty jurisdiction was the protection and the promotion of the maritime shipping industry through the development and application, by neutral federal courts, of a uniform and specialized body of federal law." *Adams*, 528 F.2d at 439; *accord* Preble Stolz, *Pleasure Boating and Admiralty:* Erie *at Sea*, 51 Cal. L. Rev. 661, 670 (1963) ("The civil jurisdiction of the admiralty courts was only occasionally adverted to in the debates in the Constitutional Convention and the state ratifying conventions. . . . [B]ut those who have reviewed the history seem generally agreed that much of the justification for federal civil jurisdiction in admiralty was the protection of merchants, notably foreign traders . . . ."). We explained in *Aqua Log* that admiralty jurisdiction extends to waterways where there is no current commerce but the waterway is

10

capable of supporting commerce because it "creates a climate conducive to commercial maritime activity" and because "a test . . . that requires actual commercial activity is unpredictable." 709 F.3d at 1061. But "in the absence of commercial activity, present or potential, there is no ascertainable federal interest justifying the frustration of legitimate state interests." *Adams*, 528 F.2d at 439; *accord Chapman*, 575 F.2d at 149–50 ("No purpose is served by application of a uniform body of federal law, on waters devoid of trade and commerce, to regulate the activities and resolve the disputes of pleasure boaters." (quoting *Adams*, 528 F.2d at 440)).

Tundidor also argues that, even without a historical analysis, the Coral Park Canal has a navigable connection to the Miami River with minor portage around the water control structure. Alejandro Suarez, an experienced boater, stated in an affidavit that he had traveled in a two-person canoe from the Coral Park Canal to the S-25B water control structure. From there, Suarez landed the canoe on a grass embankment south of the structure, got out of the canoe, carried the canoe a few hundred feet around the structure, and then launched the canoe back into the water on the other side. Tundidor argues that a waterway can be navigable regardless of the type or size of vessels presently navigating the waterway and despite occasional portages. But again, Tundidor cites decisions that consider the power of Congress and federal agencies, not admiralty jurisdiction. *See Econ. Light &*

11

*Power Co. v. United States*, 256 U.S. 113 (1921); *Consol. Hydro*, 968 F.2d 1258; *Miami Valley Conservancy Dist.*, 692 F.2d 447.

Portage does not allow the Coral Park Canal to satisfy the location requirement of admiralty jurisdiction because portage is neither a "customary," *The Daniel Ball*, 77 U.S. (10 Wall.) at 563, nor a practical means of carrying on interstate commerce. In *LeBlanc*, the Second Circuit rejected the argument that an area of the Hudson River cut off by a dam was navigable for purposes of admiralty jurisdiction because "kayakers can portage around the dams." 198 F.3d at 360. "Navigability requires that the body of water be capable of supporting *commercial* maritime activity," and "the possibility of recreational use assisted by multiple portages" is insufficient. *Id.*

Tundidor also cites descriptions of the Tamiami Canal by a federal agency and a state agency, but neither are evidence that the Tamiami Canal is navigable for the purposes of admiralty jurisdiction. The Environmental Protection Agency has stated that the Tamiami Canal is a "navigable water of the United States" under the Clean Water Act, but the Supreme Court has explained that "the meaning of 'navigable waters' in the Act is broader than the traditional understanding of that term," *Rapanos v. United States*, 547 U.S. 715, 731 (2006) (plurality opinion); *accord id.* at 768 (Kennedy, J., concurring in the judgment). The Miami-Dade Expressway Authority has also described the Tamiami Canal as an "important

12

water management system, transportation corridor, and recreational facility," but the Expressway Authority made no legal determination. And a "transportation corridor" is not the same as a highway supporting interstate commerce.

## IV. CONCLUSION

We **AFFIRM** the dismissal of Tundidor's complaint.

13