**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: THE MATTER OF THE
COMPLAINT OF MISSION BAY JET
SPORTS, LLC; AND ROBERT
ADAMSON, INDIVIDUALLY AND D/B/A
MISSION BAY JET SPORTS FOR
EXONERATION FROM OR LIMITATION
OF LIABILITY,

MISSION BAY JET SPORTS, LLC, a
California Limited Liability
Corporation; ROBERT ADAMSON,
individually and d/b/a MISSION
BAY JET SPORTS, LLC,
                    *Plaintiffs-Appellants,*

v.

HALEY COLOMBO; JESSICA SLAGEL,
                    *Defendants-Appellees.*

No. 08-56142

D.C. No.
CV-08-00146-JM-
CAB

OPINION

Appeal from the United States District Court
for the Southern District of California
Jeffrey T. Miller, District Judge, Presiding

Argued and Submitted
June 3, 2009—Pasadena, California

Filed June 24, 2009

Before: Pamela Ann Rymer and Susan P. Graber,
Circuit Judges, and Ann Aldrich,* District Judge.

*The Honorable Ann Aldrich, Senior United States District Judge for
the Northern District of Ohio, sitting by designation.

Opinion by Judge Rymer

---

**COUNSEL**

Sterling J. Stires, Law Offices of Charles S. LiMandri, Rancho Santa Fe, California, for the plaintiffs-appellants.

Thomas L. Tosdal (argued) and Ann M. Smith, Tosdal, Smith, Steiner & Wax, San Diego, California, for the real parties in interest, defendants-appellees.

---

**OPINION**

RYMER, Circuit Judge:

We must decide whether admiralty jurisdiction exists over tort claims by two women who were seriously injured when thrown off a jet-propelled Sea-Doo personal watercraft, allegedly operated negligently, on navigable waters in an area of San Diego's Mission Bay that is reserved for the use of such vessels. The district court thought not, but we believe both the location of the accident and its connection to traditional maritime activity sustain admiralty jurisdiction. Accordingly, we reverse and remand.

I

After hours on the evening of July 29, 2007, a friend asked Brett Kohl, who worked at Mission Bay Jet Sports, for a jet

ski for himself and a group of friends. Kohl took a Sea-Doo personal watercraft to Mission Bay, where he offered rides to two teenagers, Haley Colombo and Jessica Slagel. With them on board, he drove the watercraft in a cul-de-sac of the South Pacific Passage that is reserved for personal watercraft by posted signs and a north-south buoy line across the west, or ocean-facing, side of the area. Slagel and Colombo allege in a state court complaint that Kohl drove the watercraft in tight circles at 25 miles per hour. They were tossed off once, asked Kohl not to do it again, got back on, and were thrown off again, this time with the unfortunate consequence that each was seriously hurt by the force of the vessel's jet propulsion system. Kohl drove Colombo back to land, while a friend drove Slagel. Care was administered by paramedics on shore before Colombo and Slagel were taken to the hospital.

Mission Bay Jet Sports and its owner, Robert Adamson, brought this action in federal district court under Federal Rule of Civil Procedure 9(h)[1] and Supplemental Rule F for Admiralty or Maritime Claims,[2] invoking the court's admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) and seeking exoneration or limitation of their liability to the $6,005 value of the watercraft under the Shipowners Limitation of Liability Act, 46 U.S.C. § 30505. They also asked for an injunction against further prosecution of the state court action as to them. The district court stayed the state court action. Slagel and Colombo moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) and (b)(6), contending that the court lacked subject matter jurisdiction and that no relief was available under the Limitation of Liability Act.

---

[1]Fed. R. Civ. P. 9(h) permits pleading of claims for relief that are "within the admiralty or maritime jurisdiction and also within the court's subject-matter jurisdiction on some other ground."

[2]Fed. R. Civ. P., Supp. R. F permits the filing of a complaint under admiralty jurisdiction for exoneration from, and limitation of liability for, claims against a shipowner, and it outlines procedures for the limitation action.

The district court found that the incident occurred on navigable waters because the area was within the ebb and flow of the tide of the Pacific Ocean. It also found that the cul-de-sac was isolated, shallow, and without commercial shipping, and that there were no docks, wharfs, or commercial establishments in the personal watercraft area, that jet ski rental establishments are located outside Mission Bay Park, and that there was no Coast Guard or Harbor Patrol rescue. The court concluded that there was no potential impact on maritime commerce because the incident involved injuries from a single-recreational vessel accident in an area where no commercial shipping occurs. Accordingly, it dismissed the action for lack of admiralty jurisdiction and, having done so, did not reach applicability of the Limitation of Liability Act.

Mission Bay Jet Sports and Adamson timely appealed.[3]

## II

**[1]** The United States Constitution grants original jurisdiction to federal courts to hear admiralty claims. *See* U.S. Const. art. III, § 2, cl. 1. This jurisdiction, codified at 28 U.S.C. § 1333(1), allows the filing of claims related to maritime contracts and maritime torts. A party seeking to invoke federal admiralty jurisdiction "over a tort claim must satisfy both a location test and a connection test." *Gruver*, 489 F.3d at 982 (citing *Jerome B. Grubart*, *Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995)). The tort must occur on navigable waters and bear a "significant relationship to traditional maritime activity." *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 674 (1982). Thus the "location" prong focuses on "whether the tort occurred on navigable water or whether

---

[3]We review a dismissal for lack of subject matter jurisdiction *de novo*, *Gruver v. Lesman Fisheries Inc.*, 489 F.3d 978, 982 (9th Cir. 2007), and the district court's findings of fact — which it is free to make on a Rule 12(b)(1) motion — for clear error, *H2O Houseboat Vacations Inc. v. Hernandez*, 103 F.3d 914, 916 (9th Cir. 1996).

injury suffered on land was caused by a vessel on navigable water." *Grubart*, 513 U.S. at 534. The "connection" or "nexus" test "raises two issues." *Id.* "A court, first, must 'assess the general features of the type of incident involved' to determine whether the incident has 'a potentially disruptive impact on maritime commerce.' " *Id.* (quoting *Sisson v. Ruby*, 497 U.S. 358, 363, 364 n.2 (1990)). "Second, a court must determine whether 'the general character' of the 'activity giving rise to the incident' shows a 'substantial relationship to traditional maritime activity.' " *Id.* (quoting *Sisson*, 497 U.S. at 364 & n.2, 365).

## A

The parties do not dispute that the Sea-Doo personal watercraft is a "vessel" for purposes of admiralty jurisdiction under 1 U.S.C. § 3. Nor is there a serious question that Mission Bay, including the reserved area where the accident in this case occurred, is a body of navigable water because it is open to the Pacific Ocean and subject to the ebb and flow of tides. As we held in *Stone v. Paradise Holdings, Inc. (In re Complaint of Paradise Holdings, Inc.)*, "in tidal waters, the ebb and flow of the tides remains the standard." 795 F.2d 756, 759 (9th Cir. 1986).

Colombo and Slagel argue that the personal watercraft area should nevertheless not be considered navigable because it is one to two miles from the ocean, past two bridges, cordoned off by a row of buoys, and limited to personal watercraft. While true, these facts have nothing to do with whether the body of water is subject to the ebb and flow of the tides. Nor do the buoys or the bridges form a barrier to commerce, as in the cases upon which Colombo and Slagel rely. *Cf. Adams v. Mont. Power Co.*, 528 F.2d 437 (9th Cir. 1975) (holding that federal courts had no jurisdiction over a tort claim on a stretch of the Missouri River dammed at both ends and situated entirely within the State of Montana); *LeBlanc v. Cleveland*, 198 F.3d 353 (2d Cir. 1999) (holding that the waters in an

area of the Hudson River were not navigable because they were not accessible to the ocean or continuous boating given nine dams and several water falls); *In re Complaint of Three Buoys Houseboat Vacations U.S.A. Ltd. v. Morts*, 921 F.2d 775 (8th Cir. 1990) (holding that the Lake of the Ozarks was not navigable water because it is entirely contained within the State of Missouri and entry or exit is blocked by the Bagnell Dam). Although commercial vessels and personal watercraft are supposed to operate in different areas of Mission Bay, it is a rule that keeps personal watercraft from venturing beyond the cul-de-sac to the ocean, or vice-versa for other vessels. The reserved area itself is several hundred feet wide and from 8 to 10 feet deep. The area is neither enclosed nor obstructed; the rest of Mission Bay, as well as the Pacific Ocean, are accessible for trade or travel.

**[2]** We conclude that the waters where the accident occurred, being subject to tidal influence, meet the definition of "navigable waters" for purposes of admiralty jurisdiction.

B

Whether the general features and character of the particular incident have a sufficient "connection" or "nexus" to maritime commerce is a more difficult question, but one we are guided by *Foremost*, *Sisson*, and *Grubart* to answer affirmatively.

**[3]** In *Foremost*, the Court upheld admiralty jurisdiction over the collision of two pleasure boats on the navigable waters of the Amite River in Louisiana. In doing so, the Court reiterated that the wrong must have a significant relationship with traditional maritime activity, but that the maritime activity need not be a commercial one. 457 U.S. at 674. It sufficed that the wrong in that case involved the negligent operation of a vessel on navigable waters. As the Court explained:

> The federal interest in protecting maritime commerce cannot be adequately served if admiralty juris-

diction is restricted to those individuals actually *engaged* in commercial maritime activity. This interest can be fully vindicated only if *all* operators of vessels on navigable waters are subject to uniform rules of conduct. The failure to recognize the breadth of this federal interest ignores the potential effect of noncommercial maritime activity on maritime commerce. For example, if these two boats collided at the mouth of the St. Lawrence Seaway, there would be a substantial effect on maritime commerce, without regard to whether either boat was actively, or had been previously, engaged in commercial activity.

*Id*. at 674-75 (emphasis in original).

The tort claims in *Sisson* arose when a fire (caused by a defective washer/dryer) aboard a pleasure boat docked at a marina, burned the boat, some other boats, and the marina. The Court distilled the inquiry to two points: that the incident causing the harm — burning boats at a marina on navigable waters — was of a sort "likely to disrupt [maritime] commercial activity," 497 U.S. at 363, and that the activity giving rise to the incident — storing a vessel on navigable waters — bore a substantial relationship to traditional maritime activity, *id.* at 364-67.

*Grubart* further explicated the *Sisson* test. There, a suit in admiralty was brought by owners of downtown Chicago buildings that were flooded as a result of work done by a crane that was sitting on a barge in the Chicago River. The crane drove piles into the riverbed, but this activity weakened an underwater tunnel such that eventually the tunnel (and buildings in the Loop) were opened to river water. 513 U.S. at 529. Noting that the first prong of the *Sisson* test goes to potential effects, not the particular facts of the actual incident, the Court indicated that the incident being examined should be described "at an intermediate level of possible generality." *Id.* at 538. Thus, *Grubart* described the "general features" of

the flooding incident "as damage by a vessel in navigable water to an underwater structure." *Id.* at 539. So described, the Court had little difficulty concluding this is the sort of incident that has a potentially disrupting impact on maritime commerce. *Id.* Moving to the second part of the *Sisson* test, the Court framed the inquiry as whether the "general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Id.* It pointed out that "[n]avigation of boats in navigable waters clearly falls within the substantial relationship." *Id.* at 540 (citing *Foremost*, 457 U.S. at 675). Then the Court characterized the activity that gave rise to flooding "as repair or maintenance work on a navigable waterway performed from a vessel." *Id.* And it concluded that this activity was substantially related to traditional maritime activity because barges and similar vessels have traditionally done that sort of work. *Id.*

Since *Foremost*, *Sisson*, and *Grubart*, we have taken an inclusive view of what general features of an incident have a potentially disruptive effect on maritime commerce. For example, in *Gruver* we held that an employer's assault on a crewman on a fishing vessel had a potentially detrimental effect on maritime commerce by depriving the vessel of a deckhand due to his injuries. 489 F.3d at 982-83. In *Taghadomi v. United States*, 401 F.3d 1080, 1086 (9th Cir. 2005), we held that injury to boaters, whose vessel capsized at sea, caused by a potential rescuer's negligence in carrying out its rescue operation could potentially affect maritime commerce because the "efficacy of search-and-rescue operations has a direct effect on the health and lives of seamen," and "insofar as the rescuer can preserve the vessel, it prevents economic loss to the vessel's owner." In *Wallis v. Princess Cruises, Inc.*, 306 F.3d 827, 840-41 (9th Cir. 2002), we held that a claim for intentional infliction of emotional distress by a passenger on a cruise ship stemming from a master's speculation that the passenger's husband, who had fallen overboard, had probably been "chopped up" by the ship's propellers, came within admiralty jurisdiction as the incident involved a "cruise

ship's treatment of passengers generally," which "clearly has potential to disrupt commercial activity." *Cf. H2O Houseboat*, 103 F.3d at 916-17 (holding that a family's being poisoned by carbon monoxide aboard a houseboat tied to the shore of Lake Havasu could not disrupt maritime commerce).[4]

[4] Applying these cases here, we believe the incident is best described as harm by a vessel in navigable waters to a passenger. Although Colombo and Slagel point out that this particular incident did not *actually* disrupt commercial activity, the disruption prong does not turn on what happened in this particular case but on whether the general features of the incident have a *potentially* disruptive effect. We think it follows from *Foremost*, *Sisson,* and *Grubart*, as well as their progeny in this circuit, that an incident of this class could have a potentially disruptive impact. Among other things, a vessel from which a passenger goes overboard in navigable waters would likely stop to search and rescue, call for assistance from others — which, in this area, could include the Coast Guard[5] and in fact did involve another vessel — and ensnarl maritime traffic in the lanes affected.

[5] So far as the second prong is concerned, we believe the activity giving rise to the incident is best characterized as operating a vessel in navigable waters. As *Foremost* and *Gru-*

---

[4]*Compare Mink v. Genmar Indus., Inc.*, 29 F.3d 1543, 1546 (11th Cir. 1994) (holding that a maritime nexus was shown where an injured passenger who was slammed to the deck "could have fallen forward, striking the pilot or controls, thus directly interfering with the navigation of the craft and potentially causing an accident with another craft," or "the disruption of a serious passenger injury within such intimate confines could have distracted the pilot and indirectly interfered with the navigation of a vessel").

[5]Coast Guard navigational rules apply. *See* 33 U.S.C. §§ 2001(a) & 2003(o) (applying rules to all vessels on navigable waters shoreward of navigation demarcation lines dividing high seas from harbors); 33 C.F.R. § 80.1106 (establishing demarcation line between "Mission Bay South Jetty Light 2 to Mission Bay North Jetty Light 1" at the entrance of Mission Bay, which includes the area reserved for personal watercraft).

*bart* say, this "clearly falls within the substantial relation-ship." *Grubart*, 513 U.S. at 540 (citing *Foremost*, 457 U.S. at 675); *see Paradise Holdings*, 795 F.2d at 760 (observing that the alleged wrong was the negligent operation of a vessel in navigable waters).**6** Vessels have traditionally carried passen-gers across navigable waters. Being a vessel, this jet ski has a maritime connection.

Like Grubart, Colombo and Slagel argue that this reads *Sis-son* too broadly. Like *Grubart*, we don't think so. *See* 513 U.S. at 542-43. Unlike *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249 (1972), for example, where an air-plane crashing fortuitously into navigable waters was not maritime-related, here there is a clear connection between a vessel traveling on navigable waters, causing injury to a pas-senger, and traditional maritime activity.

[6] We conclude that the incident occurred on navigable waters. Its general features — harm by a vessel in navigable waters to a passenger — had a potential effect on maritime commerce, and the general character of the activity — opera-tion of a vessel in navigable waters — had a substantial rela-tionship to traditional maritime activity. Consequently, the federal district court had admiralty jurisdiction.

---

**6***See also Hogan v. Overman*, 767 F.2d 1093, 1094 (4th Cir. 1985) (holding, in a case where a water skier sued the owner of the boat that was towing him when he fell and injured himself, the allegation of "naviga-tional error" or the "negligent operation of a vessel on navigable waters" that gave rise to the skier's injury was sufficient to show a substantial rela-tionship with traditional maritime activity); *cf. Foster v. Peddicord*, 826 F.2d 1370, 1375 & n.1 (4th Cir. 1987) (distinguishing *Hogan* where two water skiers collided and sued each other, noting that, unlike "*Foremost* . . ., the controversy in this case does not arise out of an alleged naviga-tional error such as occurs when a pleasure craft collides with a swimmer, water skier, reef, or another vessel").

## III

Because it thought that admiralty jurisdiction was lacking, the district court understandably never reached the issue of whether a claim could proceed under the Shipowners Limitation of Liability Act. This inquiry may involve factual questions on which the record is undeveloped. For these reasons, we prefer not to decide issues arising under the Act ourselves. Instead, we leave them for the district court to consider in the first instance. Accordingly, having determined that the court's admiralty jurisdiction was properly invoked, we remand for further proceedings.

REVERSED AND REMANDED.