Tandon v. Ulbrick

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————————

August Term, 2013

(Argued: January 13, 2014                    Decided: May 19, 2014)

Docket No. 13-461
————————

SAPNA TANDON and ROBERT DOOHAN, III,
as owners and/or owners pro hac vice of a 2005 39' Outer Limits motor vessel,

*Petitioners-Appellants*,

—v.—

CAPTAIN'S COVE MARINA OF BRIDGEPORT, INC., JILL WILLIAMS, KAYE ANTHONY
WILLIAMS, BRUCE WILLIAMS, THE RESTAURANT AT CAPTAIN'S COVE INC., AKA
RESTAURANT AT CAPTAIN'S COVE, and RYAN ULBRICK,

*Claimants-Appellees*,

FRANK GENNA, DONNA GENNA, MICHAEL HERMANN, and ROBERT BARBIERI,

*Third-Party Defendants–Appellees.*[*]

————————

_____

[*]The Clerk of the Court is respectfully directed to amend the official caption to
conform with that above.

Before :

KATZMANN, *Chief Judge*, LIVINGSTON, *Circuit Judge*, and CARTER, *District Judge.*[**]

_____

Appeal from a judgment entered on January 7, 2013, by the United States District Court for the District of Connecticut (Hall, *J.*) pursuant to a decision and order entered by that court on December 21, 2012, dismissing the action for lack of subject matter jurisdiction. We hold that federal admiralty jurisdiction does not extend to tort claims arising from a physical altercation among recreational visitors on and around a permanent dock surrounded by navigable water, because such an altercation does not have a potentially disruptive effect on maritime commerce. Accordingly, the district court's judgment is **AFFIRMED**.

_____

JAMES E. MERCANTE (Keith A. Brady, *on the brief*), Rubin Fiorella & Friedman LLP, New York, NY, *for Petitioners-Appellants.*

LAWRENCE B. BRENNAN (Andrea C. Sisca and Samuel I. Reich, *on the brief*), Wilson Elser Moskowitz Edelman & Dicker LLP, Stamford, CT, *for Claimant-Appellee Ryan Ulbrick.*

_____

_____

[**] The Honorable Andrew L. Carter, Jr., United States District Judge for the Southern District of New York, sitting by designation.

KATZMANN, *Chief Judge*:

This case calls upon us to determine whether federal admiralty jurisdiction extends to tort claims arising from a physical altercation among recreational visitors on and around a permanent dock surrounded by navigable water. We hold that federal admiralty jurisdiction does not reach the claims at issue here, because this type of incident does not have a potentially disruptive effect on maritime commerce.

Petitioners-Appellants Sapna Tandon and Robert Doohan, III, are the owners of the *Up and Over*, a thirty-nine-foot fiberglass powerboat designed for recreational purposes. On May 28, 2010, visitors on the *Up and Over* were involved in a fistfight on a floating dock operated by Claimant-Appellee Captain's Cove Marina of Bridgeport, Inc. ("Captain's Cove"). At least one person was seriously injured in the fight. Tandon and Doohan subsequently filed a petition for limitation of liability[1] in the United States District Court for the

---

[1] In 1966, the procedural rules governing federal civil cases and federal admiralty cases were unified, and the former Federal Rules of Practice in Admiralty and Maritime Cases were superseded by the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supp. R."). *See* Supp. R. Rule A, 1966 advisory committee's note. As part of this unification, the Supplemental Rules adopted certain terminology from the Federal Rules of Civil Procedure; they refer to a "complaint" for limitation of liability, and they call the person filing that pleading a "plaintiff." In order to minimize confusion, we adhere to the more common practice of using the terms "petition" and "petitioner." *See* 3 Benedict on Admiralty § 1 (7th ed. rev. 2009).

District of Connecticut (Hall, *J.*), seeking to limit their tort liability for the incident. The district court dismissed their petition for lack of subject matter jurisdiction, holding that this case falls outside the general grant of admiralty jurisdiction in 28 U.S.C. § 1333. We now affirm.

## BACKGROUND

A.  Factual Background

Captain's Cove operates a marina in Bridgeport, Connecticut, on the waters of Black Rock Harbor and Cedar Creek, which open onto Long Island Sound. The marina facilities include a dockside restaurant, several docks extending from the dry land into the harbor, and a floating dock (the "South Dock") accessible only by water. A water taxi runs from the South Dock to the restaurant and other facilities.

On May 28, 2010, Tandon and Doohan took several passengers[2] on the *Up and Over* on a social trip to Captain's Cove. They docked the *Up and Over* by the marina restaurant, and proceeded inside for food and drinks. Claimant-Appellee Ryan Ulbrick, who had also been invited along, arrived at Captain's Cove by car and met the others there.

At about the same time, Third-Party Defendant–Appellee Frank Genna and two companions also made a social visit to Captain's Cove. They arrived in a boat owned by one of Genna's companions, moored at the South Dock, and then took a water taxi to the marina restaurant. Genna and his companions were not previously acquainted with Tandon, Doohan, or their companions.

Both parties left the restaurant at about the same time. As Tandon, Doohan, and their passengers were boarding the *Up and Over*, one of those passengers fell

---

[2] We use the term "passenger" throughout in its broad general sense of "a person who travels in a conveyance . . . without participating in its operation." *passenger, n.*, The American Heritage Dictionary 1285 (4th ed. 2000). We do not mean to invoke the special admiralty usage of this term for "a person who travels in a public conveyance *by virtue of a contract, express or implied, which involves paying a fare or some other consideration*." 1 Thomas J. Schoenbaum, Admiralty and Maritime Law, § 5-5, at 269–70 (5th ed. 2011) (emphasis added). Nothing in the record indicates that the passengers on board the *Up and Over* paid any consideration for their voyage; to the contrary, the available evidence indicates that they were social guests, and so likely "visitors" under admiralty law. *See id.* at 270 ("A visitor is a person other than a passenger or a member of the crew who is on board with the express or implied consent of the shipowner or operator of the vessel.").

into the water and injured himself. Genna and his companions laughed at the mishap, leading the passengers on the *Up and Over* to yell unspecified but presumably unfriendly comments in response. Genna and his companions then boarded the water taxi to return to the South Dock, and both the *Up and Over* and the water taxi left the main docks.

At that point, the parties' accounts diverge somewhat. According to an affidavit filed by Ulbrick, the water taxi headed slightly northeast, toward the north end of the South Dock, while the *Up and Over* headed southwest down the channel toward Long Island Sound. As the *Up and Over* was making its way down the channel, Tandon noticed that the passenger who fell while boarding the *Up and Over* was bleeding from a scalp wound. She therefore asked Doohan, who was piloting the boat, to pull over and moor so that she could examine the passenger's injuries. According to the state court complaint filed by Genna, on the other hand, the *Up and Over* followed in hot pursuit of the water taxi toward the South Dock. Meanwhile, its passengers yelled and screamed at Genna and his companions, and at one point threw a beer bottle at them.

The parties agree that both the *Up and Over* and the water taxi docked at the South Dock, where a fistfight broke out between Genna's party and the

passengers of the *Up and Over*. During the fight, one passenger from the *Up and Over* hit Genna, knocking him off of the South Dock into the water. According to Ulbrick, Genna landed face-down in the water and appeared unconscious; according to Genna, he was physically held underwater to the point of asphyxia. Genna claims that he suffered severe injuries from the lack of oxygen, including "cardiac arrest, respiratory failure, hypoxic encephalopathy resulting in permanent brain damage[,] and multi-organ failure." J.A. 40.

B.    Procedural Background

Genna and his wife Donna Genna (together, "the Gennas") filed suit in Connecticut state court against Captain's Cove and several persons affiliated with it (together, "the Captain's Cove defendants").[3] They alleged that the Captain's Cove defendants were liable for Genna's injuries, and for Donna Genna's resulting loss of consortium, under theories of negligent supervision, negligence, and reckless dispensing of liquor, and also under the Connecticut

---

[3] Specifically, the Gennas named as defendants "Captain's Cove Marina of Bridgeport, Inc. a/k/a The Restaurant at Captain's Cove, Inc. a/k/a Restaurant at Captain's Cove"; Jill Williams, as the "[p]ermittee" of Captain's Cove; and Kaye Williams and Bruce Williams, as the "backers" of Captain's Cove. J.A. 81–82. Captain's Cove Marina of Bridgeport, Inc. and The Restaurant at Captain's Cove Inc., a/k/a Restaurant at Captain's Cove, are apparently separate entities and are represented by different counsel in the present appeal.

Dram Shop Act.[4] The Captain's Cove defendants responded by filing a third-party complaint against Tandon, Doohan, and their passengers on the *Up and Over* (including Ulbrick). In that third-party complaint, the Captain's Cove defendants sought contribution and indemnity for any damages they might be required to pay the Gennas. The Gennas then filed a second amended complaint adding Tandon, Doohan, and the passengers on the *Up and Over* as third-party defendants, and asserting claims against them for negligence, recklessness, assault and battery, and conspiracy.[5]

Tandon and Doohan proceeded to file a petition for limitation of liability in the United States District Court for the District of Connecticut, initiating the present case. That petition asked the district court to either exonerate Tandon and Doohan from liability for the incident at Captain's Cove, or else limit their liability to the value of the *Up and Over* (appraised at $285,000). In accordance with the normal rules governing limitation proceedings, the district court stayed

---

[4] The Connecticut Dram Shop Act, Conn. Gen. Stat. § 30-102, makes a person who "sells any alcoholic liquor to an intoxicated person" liable to any other person injured as a consequence of the buyer's intoxication. *See Zucker v. Vogt*, 329 F.2d 426, 427–28 (2d Cir. 1964).

[5] Along with Tandon, Doohan, and Ulbrick, this second amended complaint named Jose Guzman, Brandon McNeal, Ziba Guy, Michael Hermann, Stacy Romano, Robert Barbieri, and Michael Spregue as third-party defendants.

the pending state court proceedings and ordered that notice be sent to all persons asserting claims with respect to the incident. The Gennas, the Captain's Cove defendants, and Ulbrick all filed claims in the limitation proceeding; two other passengers on the *Up and Over*, Michael Hermann and Robert Barbieri, also filed notices of potential claims.

Ulbrick then moved to dismiss the petition under Federal Rule of Civil Procedure 12(b)(1), asserting that the district court lacked subject matter jurisdiction. The district court agreed. Applying the jurisdictional analysis laid out in *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995), the district court held that the alleged torts at issue in this case failed both the "location" test and the "connection" test for federal admiralty jurisdiction. It held the location test was not met because the fight in which Genna was injured took place primarily on the South Dock, and this floating dock was properly considered an extension of land because it remained permanently in a fixed location. It also held that the connection test was not met because the type of incident involved—which the district court characterized as "[a] fight on a dock"—did not have a potentially disruptive impact on maritime commerce. J.A. 130. The district court therefore dismissed the petition for lack of subject matter jurisdiction.

Tandon and Doohan then filed the present appeal. We have jurisdiction under 28 U.S.C. § 1291, and now affirm.

## DISCUSSION

A.      Standard of Review

"When reviewing a district court's determination of subject matter jurisdiction pursuant to [Rule] 12(b)(1), we review factual findings for clear error and legal conclusions *de novo.*" *Close v. New York*, 125 F.3d 31, 35 (2d Cir. 1997). In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction. *See Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (per curiam). But "[w]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) (quoting *LeBlanc v. Cleveland*, 198 F.3d 353, 356 (2d Cir. 1999)). In that case, the party asserting subject matter jurisdiction "has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

10

B.      Admiralty Jurisdiction

Under our Constitution, the federal judicial power extends "to all Cases of admiralty and maritime Jurisdiction." U.S. Const. art. III, § 2, cl. 1. Congress has codified that jurisdiction at 28 U.S.C. § 1333(1), which gives federal district courts original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." *See Vasquez v. GMD Shipyard Corp.*, 582 F.3d 293, 298 (2d Cir. 2009). "The primary purpose of federal admiralty jurisdiction is to protect commercial shipping with uniform rules of conduct." *MLC Fishing, Inc. v. Velez*, 667 F.3d 140, 141–42 (2d Cir. 2011) (per curiam) (quoting *Vasquez*, 582 F.3d at 298).

In this case, Tandon and Doohan invoked the district court's admiralty jurisdiction by filing a petition for exoneration from or limitation of liability. That petition is a form of action peculiar to the admiralty and maritime context. It seeks the protection of the Limitation of Liability Act, first enacted by Congress in 1851 "to encourage ship-building and to induce capitalists to invest money in this branch of industry." *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 446 (2001) (quoting *Norwich Co. v. Wright*, 80 U.S. (13 Wall.) 104, 121 (1872)). Under the present version of this statute, "the liability of the owner of a vessel for any claim, debt, or liability [covered by the Act] shall not exceed the value of the vessel and

11

pending freight." 46 U.S.C. § 30505(a). It applies broadly, limiting the owner's liability for any claims arising from "embezzlement, loss, or destruction of any property, goods, or merchandise shipped or put on board the vessel, any loss, damage, or injury by collision, or any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of the owner." *Id.* § 30505(b). The Act thus protects the owner of a vessel from unlimited vicarious liability for damages caused by the negligence of his captain or crew. *See In re City of N.Y.*, 522 F.3d 279, 283 (2d Cir. 2008).

To take advantage of this statute, "[t]he owner of a vessel may bring a civil action in a district court of the United States for limitation of liability." 46 U.S.C. § 30511(a). The owner may also seek total exoneration from liability in the same action (for instance, by asserting an affirmative defense that bars potential claims). *See* Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supp. R.") Rule F(2). Once the owner files a petition for limitation, "all [other] claims and proceedings against the owner related to the matter in question shall cease." 46 U.S.C. § 30511(c). The district court then "issue[s] a notice to all persons asserting claims with respect to which the [petition] seeks limitation," instructing such claimants to file their claims in the

12

limitation proceeding before a specified deadline. Supp. R. Rule F(4). Claimants may also file an answer challenging the petitioner's right to exoneration from or limitation of liability. *Id.* Rule F(5). If the petition for limitation of liability is granted, the owner can be liable on the covered claims only up to the total value of his vessel and its pending freight; that amount will then be distributed pro rata among the proven claims. *Id.* Rule F(8).

Although the Limitation of Liability Act provides a federal cause of action for a vessel owner seeking exoneration or limitation, it "does not provide an independent foundation for federal admiralty jurisdiction." *MLC Fishing*, 667 F.3d at 143. That is, the fact that a vessel owner may file a petition for limitation does not mean the district court necessarily has jurisdiction to hear it. Instead, the district court will only have admiralty jurisdiction to hear a petition for limitation if it already has admiralty jurisdiction over the underlying claims that the petition seeks to limit. *See id.* at 143–44. We therefore ask whether the underlying claims raise a "civil case of admiralty or maritime jurisdiction" that the district court could hear under 28 U.S.C. § 1333(1).

13

Here, the petition seeks to limit liability on underlying claims that sound in tort. We therefore turn to examine the scope of federal admiralty jurisdiction over maritime tort claims.

1.    Legal Standard

"The traditional test for admiralty tort jurisdiction asked only whether the tort occurred on navigable waters. If it did, admiralty jurisdiction followed; if it did not, admiralty jurisdiction did not exist." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 531–32 (1995). The location of the tort normally depended on where the plaintiff was harmed—or to use a more lawyerly phrase, where "the substance and consummation of the injury" took place. *The Plymouth*, 70 U.S. (3 Wall.) 20, 33 (1866). This could occasionally lead to odd results. For instance, the Supreme Court held on multiple occasions that when negligently piloted ships rammed structures on the land, the resulting claims were outside the law of admiralty, because the structures harmed were on the land and not in the water. *See, e.g.*, *Martin v. West*, 222 U.S. 191, 195–97 (1911) (collision between a steamship and the pier of a drawbridge); *Cleveland Terminal & Valley R.R. Co. v. Cleveland S.S. Co.*, 208 U.S. 316, 319–21 (1908) (collision involving multiple vessels and causing damage to a shore dock, bridge, protection piling, and pier); *Johnson*

14

*v. Chi. & Pac. Elevator Co.*, 119 U.S. 388, 389, 397 (1886) (collision between a schooner and a warehouse, in which the jibboom of the schooner went through the wall of the warehouse and caused a large quantity of shelled corn to run out and be lost in the Chicago River).

These ship-to-shore collision cases were superseded in 1948 by the Extension of Admiralty Jurisdiction Act, which extended admiralty jurisdiction to all "cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land." 46 U.S.C. § 30101(a); *see Grubart*, 513 U.S. at 532. But outside of cases covered by that Act, the jurisdictional test continued to focus solely on whether the tort at issue occurred on navigable water. *See, e.g.*, *Victory Carriers, Inc. v. Law*, 404 U.S. 202, 203–05 (1971) (reiterating the "historic view . . . that the maritime tort jurisdiction of the federal courts is determined by the locality of the accident," and finding no admiralty jurisdiction over an accident suffered by a longshoreman driving a forklift on a pier).

The Supreme Court first turned away from the traditional location-based rule in *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249 (1972). *Executive Jet* involved an airplane that took off from a Cleveland, Ohio airport bound for

15

Portland, Maine. Shortly after takeoff, the plane hit a flock of seagulls and crashed into the navigable waters of Lake Erie. *Id.* at 250. The owners of the airplane alleged that the air traffic controller and other airport employees had been negligent in failing to keep the runway free of seagulls or to adequately warn the plane's pilot about the birds. *Id.* at 251.

The Court declined to decide whether the alleged tort was consummated when the plane hit the birds (over land) or when it hit the water. *Id.* at 266–67. Instead, it held that the location of the tort alone was not enough to give rise to admiralty jurisdiction. At least in the aviation context, the Court declared, admiralty jurisdiction also required that the underlying incident bear a "significant relationship" to "traditional maritime activity involving navigation and commerce on navigable waters." *Id.* at 272. The Court held that a flight between two airports in the continental United States had no such significant relationship to traditional maritime activity, and therefore found no admiralty jurisdiction over the case. *Id.* at 272–74.

In *Foremost Insurance Co. v. Richardson*, 457 U.S. 668 (1982), the Court clarified that the "significant relationship" or "connection" requirement announced in *Executive Jet* was a general rule of admiralty jurisdiction, not

16

limited to the aviation context. *Id.* at 674. *Foremost* involved a collision between two noncommercial vessels—pleasure boats—in navigable water on the Amite River in Louisiana. *Id.* at 669. The Court found that the connection test was satisfied, even though neither boat was engaged in commercial maritime activity, because this type of incident had a significant potential effect on maritime commerce: "For example, if these two boats collided at the mouth of the St. Lawrence Seaway, there would be a substantial effect on maritime commerce, without regard to whether either boat was actively, or had been previously, engaged in commercial activity." *Id.* at 675. The Court determined that this potential effect on maritime commerce, "when coupled with the traditional concern that admiralty law holds for navigation," demonstrated the significant relationship necessary to support admiralty jurisdiction. *Id.*

The Court next considered the scope of admiralty tort jurisdiction in *Sisson v. Ruby*, 497 U.S. 358 (1990). In that case, a vessel owner filed a petition for limitation of liability after a fire broke out on his pleasure yacht while it was docked at a marina on Lake Michigan. The fire destroyed the yacht and damaged several nearby vessels, but no commercial vessels were affected. *Id.* at 360, 363.

17

Nevertheless, the Court held that this incident had a sufficiently significant relationship to traditional maritime activity to sustain admiralty jurisdiction.

The Court applied a two-part test in *Sisson* to determine whether the case before it had a significant connection to maritime affairs. First, the Court looked to whether the underlying incident had a potentially disruptive effect on maritime commerce. It described the underlying incident as "a fire on a vessel docked at a marina on navigable waters," *id.* at 363, and held that such a fire has a potentially disruptive effect, because it "can spread to nearby commercial vessels or make the marina inaccessible to such vessels," *id.* at 362. The Court explained, moreover, that this potential effect does not depend on "the particular facts of the incident in this case," but on "the general features of the type of incident involved." *Id.* at 363. The jurisdictional inquiry therefore turned on whether fires at marinas would generally disrupt maritime commerce, rather than on whether the particular fire at issue actually disrupted maritime commerce.

Second, the *Sisson* Court looked to whether there was a "substantial relationship between the activity giving rise to the incident and traditional maritime activity." *Id.* at 364. Again, the Court emphasized that the relevant

18

"activity giving rise to the incident" is defined by the general type of conduct from which the incident arose, not by the specific facts of the case. "In *Executive Jet*, for example, the relevant activity was not a plane sinking in Lake Erie, but air travel generally." *Id.* Likewise, in *Sisson*, the Court described the relevant activity as "the storage and maintenance of a vessel at a marina on navigable waters." *Id.* at 365. The Court found this conduct was substantially related to traditional maritime activity, *id.* at 367, and so concluded that admiralty jurisdiction was appropriate.

Finally, the Court restated and formalized the current test for admiralty tort jurisdiction in *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995). That case involved a tort claim arising from construction work in the Chicago River. A construction company had used a crane sitting on a barge in the river to drive wooden pilings into the riverbed; it thereby (allegedly) cracked a freight tunnel running under the river, causing water to pour down into the tunnel and flood buildings in downtown Chicago. The flood victims filed a number of tort actions in state court; in response, the construction company filed a petition for limitation of liability in federal district court, invoking the court's admiralty jurisdiction. *Id.* at 529–31.

The Supreme Court held that this case fell within the scope of federal admiralty jurisdiction. It began by laying out its analytical framework:

> [A] party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity. A court applying the location test must determine whether the tort occurred on navigable water or whether injury suffered on land was caused by a vessel on navigable water. The connection test raises two issues. A court, first, must assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce. Second, a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity.

*Id.* at 534 (internal quotation marks and citations omitted).

The Court then proceeded to apply that analysis to the facts before it. It held that the location test was met because the alleged injury, though occurring on land, was proximately caused by a vessel on navigable water; the location of the tort was therefore within the bounds of admiralty as defined by the Extension of Admiralty Jurisdiction Act. *Id.* at 534–37; *see* 46 U.S.C. § 30101(a). It also held that both parts of the connection test were met: i.e., that this type of incident had a potentially disruptive impact on maritime commerce, and that the general

character of the activity giving rise to the incident showed a substantial relationship to maritime commerce. *Grubart*, 513 U.S. at 538–43.

In assessing whether this type of incident had a potentially disruptive effect on maritime commerce, the Court explained that the type of incident should be described "at an intermediate level of possible generality," neither too general to distinguish different cases nor too specific to the unique facts of the particular case. *Id.* at 538–39. It thus characterized the type of incident at issue in *Grubart* as "damage by a vessel in navigable water to an underwater structure." *Id.* at 539. The Court found this type of incident could easily have a disruptive effect on maritime commerce, by disrupting the course of the waterway itself or by restricting the use of the waterway during necessary repairs. *Id.*

In applying the second part of the connection test, the Court recognized that there was "inevitably some play in the joints in selecting the right level of generality" in describing the general character of the activity giving rise to the incident. *Id.* at 542. But that "inevitable imprecision," it warned, "is not an excuse for whimsy." *Id.* The Court therefore rejected the idea that the relevant activity could be described as simply "repair and maintenance" or "pile driving," since

21

those descriptions would artificially eliminate the maritime character of the construction company's activity. *Id.* at 541.

Instead, the Court described the activity giving rise to the incident as "repair or maintenance work on a navigable waterway performed from a vessel." *Id.* at 540. It found that this activity did bear a substantial relationship to traditional maritime activity, since barges and similar vessels have traditionally been used to engage in similar repair work. *Id.* (citing cases involving repair work carried out from barges). The Court clarified that although other non-maritime activities might have contributed to the ultimate injury—for instance, the city of Chicago's alleged failure to maintain and operate the tunnel system—the substantial relationship test requires only that "one of the arguably proximate causes of the incident originate[] in the maritime activity of a tortfeasor." *Id.* at 541. Consequently, as the location test and both parts of the connection test were met, the Court held that there was federal admiralty jurisdiction over the petition for limitation of liability arising from the incident.

The test established in *Grubart* remains the current test for admiralty jurisdiction over claims sounding in tort. *See MLC Fishing*, 667 F.3d at 142; *Vasquez*, 582 F.3d at 298. To restate: First, we ask whether the alleged tort meets

22

the location test: that is, whether it occurred on navigable water or was caused by a vessel on navigable water. Second, we ask whether the alleged tort meets both subparts of the connection test: that is, whether the general type of incident involved has a potentially disruptive effect on maritime commerce, and whether the general character of the activity giving rise to the incident bears a substantial relationship to traditional maritime activity. *See Grubart*, 513 U.S. at 534. Only if the location test and both subparts of the connection test are met will admiralty tort jurisdiction be proper under 28 U.S.C. § 1333(1).

2.    Analysis

We begin our analysis with the location test, evaluating whether the underlying torts at issue in this case occurred on land or on navigable water. But the facts here present one of those "perverse and casuistic borderline situations," *Executive Jet*, 409 U.S. at 255, that have always bedeviled the traditional location test. The fistfight at issue took place on and around a floating dock surrounded by navigable water, and so one might think the tort occurred on navigable water. That dock, however, was connected by pilings to the harbor floor, making it "technically land, through a connection at the bottom of the sea." *The Blackheath*, 195 U.S. 361, 367 (1904). It also remained permanently situated in its existing

23

location, according to the district court's factual findings, and so it cannot be described as a vessel for admiralty purposes. *See Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 493–94 (2005) (holding that a watercraft that "has been permanently moored" is no longer a "vessel" for admiralty purposes).[6] Moreover, the fight occurred both on the floating dock and in the surrounding water. According to the facts recited in the district court's opinion, Genna was struck on the dock and knocked into the water. He was then held underwater to the point of asphyxiation. He consequently suffered injury both on the dock, where he was struck, and in the water, where he landed and where he was suffocated.

Like the Supreme Court in *Executive Jet*, we see no reason to resolve the difficult question of where the underlying tort (or torts) here occurred. Even assuming *arguendo* that the location test is met, admiralty jurisdiction cannot attach because the connection test is not met. In particular, we conclude that the

---

[6] At oral argument, counsel for Tandon and Doohan conceded that sections of the South Dock were moored by pilings to the floor of the harbor. However, he stated that floating docks like the South Dock are sometimes detached and taken by boat to the shore to be stored for the winter. We see no evidence in the record that the South Dock was ever detached from its existing position, and therefore see no clear error in the district court's determination that the South Dock was permanently situated in its current location.

first subpart of the connection test is not met, as this type of incident does not have a potentially disruptive effect on maritime commerce.

### a. Potential Effect on Maritime Commerce

In assessing the potential effect of this type of incident on maritime commerce, we begin by describing the incident "at an intermediate level of possible generality." *Grubart*, 513 U.S. at 538. Our description should be general enough to capture the possible effects of similar incidents on maritime commerce, but specific enough to exclude irrelevant cases. We then determine whether that type of incident is "likely to disrupt [maritime] commercial activity." *Id.* (quoting *Sisson*, 497 U.S. at 363). In so doing, we look not to the particular facts of the case before us—i.e., whether maritime commerce was actually disrupted here—but to whether similar occurrences are likely to be disruptive. The overall purpose of the exercise is to determine "whether the incident could be seen within a class of incidents that pose[] more than a fanciful risk to commercial shipping." *Id.* at 539.

We conclude that the incident at issue in this case is best described as a physical altercation among recreational visitors on and around a permanent dock surrounded by navigable water. This description accurately captures the nature of the event giving rise to this suit, and the type of risks that the incident could

pose to maritime commerce. Like the descriptions the Court has used in its cases, our description focuses on the direct and immediate cause of the injuries suffered, rather than the alleged negligence underlying the suit. *See Grubart*, 513 U.S. at 538–39 (considering "damage by a vessel in navigable water to an underwater structure"); *Sisson*, 497 U.S. at 362–63 (considering "a fire on a vessel docked at a marina on navigable waters"). It also takes into account the general location of the incident and the roles of the persons involved, both of which can be relevant to the potential effect on maritime commerce. *See Sisson*, 497 U.S. at 363 (including in its description the general location of the fire); *Vasquez*, 582 F.3d at 300 (describing the type of incident as "the death of *persons repairing and refitting a vessel*" (emphasis added)).

We conclude that this type of incident does not realistically pose a threat to maritime commerce. First, a fistfight on and around a dock cannot immediately disrupt navigation. Unlike a sinking plane (as in *Executive Jet*), a collision between vessels (as in *Foremost*), or a collision between a vessel and an underwater structure (as in *Grubart*), it does not create any obstruction to the free passage of commercial ships along navigable waterways. Nor can it lead to a disruption in the course of the waterway itself. *See Grubart*, 513 U.S. at 539.

Second, a fistfight on a dock cannot immediately damage nearby commercial vessels. The fire considered in *Sisson* threatened the safety of all other boats nearby; a fistfight threatens only its participants. As the district court correctly pointed out, "[a] fight is unlikely to spread the entire length of a dock, as a fire would, and, therefore, there is little risk that a fight would make the marina inaccessible or impact other boats." J.A. 130.

Third, the class of incidents we consider here includes only fights on permanent docks—that is, docks that are connected in a permanent fashion to the land underneath or beside navigable water, and that do not move relative to the shore (except perhaps by rising and falling with the tide). This type of incident does not pose the same risks to maritime commerce as a fistfight occurring on a vessel on navigable water. A fight on a vessel may distract the crew from their duties, endangering the safety of the vessel and risking collision with others on the same waterway. If a fight injures someone on a vessel that is at sea, moreover, that vessel may be forced to divert from its course to obtain medical care for the injured person. By contrast, a fistfight on a permanent dock does not endanger the safety of the dock itself or risk a collision between that dock and nearby vessels. And it obviously cannot require the dock to move or change course.

27

Fourth, the class of incidents we consider here involves only physical altercations among recreational visitors, not persons engaged in maritime employment. This type of incident therefore cannot have a potential effect on maritime commerce by injuring those who are employed in maritime commerce. *Cf. Vasquez*, 582 F.3d at 300 (holding there is "little question" that "the death of persons repairing and refitting a vessel" can potentially disrupt maritime commerce); *Gruver v. Lesman Fisheries Inc.*, 489 F.3d 978, 982–83 (9th Cir. 2007) (finding a potential effect on maritime commerce from "an assault on a seaman by his former maritime employer aboard a vessel in navigable waters"); *Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1119 (5th Cir. 1995) ("Without a doubt, worker injuries, particularly to those involved in repair and maintenance, can have a disruptive impact on maritime commerce by stalling or delaying the primary activity of the vessel.").[7]

[7] There is a substantial difference for admiralty purposes between an occasional visitor or passenger on a vessel and a person whose employment revolves around that vessel. *See Chandris, Inc. v. Latsis*, 515 U.S. 347, 376 (1995) (defining a "seaman" for purposes of the Jones Act as an employee whose duties "contribute to the function of the vessel or to the accomplishment of its mission," and whose "connection to a vessel in navigation . . . is substantial in terms of both its duration and its nature"). For instance, the duty of seaworthiness is owed only to seamen, not to passengers and visitors. *See* 1 Thomas J. Schoenbaum, Admiralty and Maritime Law, § 6-27, at 501 (5th ed. 2011). Likewise, because the relation between seamen and their employers is central to maritime commerce, it is well established that federal admiralty jurisdiction extends

We therefore conclude that the type of incident involved here—a physical altercation among recreational visitors on and around a permanent dock surrounded by navigable water—presents no realistic threat to maritime commerce.

####     b.     Counterarguments

Tandon and Doohan raise several counterarguments, none of which we find persuasive. First, they claim that the "type of incident" involved should include the actions leading up to the fistfight—including their alleged negligence in piloting the *Up and Over* in hot pursuit of the water taxi. That argument confuses the first and second parts of the connection test. The first part of the connection test looks to the nature of the incident that immediately caused the underlying injury; the second part, by contrast, looks to the nature of the broader activity giving rise to that incident. To take a few concrete examples: the type of incident at issue in *Executive Jet* was an airplane crash in navigable water, while the nature of the activity giving rise to that incident was air travel generally. *See Sisson*, 497 U.S. at 363–64 (describing *Executive Jet*). The type of incident at issue in

---

to claims by seamen against their employers even for injuries on land. *See O'Donnell v. Great Lakes Dredge & Dock Co.*, 318 U.S. 36, 42–43 (1943); *see also* Schoenbaum, *supra*, § 3-7, at 160–62 & n.3.

29

*Foremost* was a collision between two boats on navigable water, while the nature of the activity giving rise to that incident was the navigation of vessels generally. *Id.* (describing *Foremost*). The type of incident at issue in *Sisson* was a fire on a vessel docked at a marina on navigable waters, while the activity giving rise to that incident was the storage and maintenance of a vessel at a marina on navigable waters. *Id.* at 363–65. In each case, the first part of the connection test looked more narrowly at the event that directly caused the injury at issue; the second part of the connection test looked more broadly at the proximate causes of that event. *Cf. Grubart*, 513 U.S. at 541 (asking, in applying the second part of the connection test, "whether one of the arguably proximate causes of the incident originated in the maritime activity of a tortfeasor"). Here, the event that immediately caused Genna's injuries was the physical altercation on and around the South Dock. It is that "incident" to which we look in determining the "type of incident" at issue and its potential effect on maritime commerce.

Tandon and Doohan next emphasize that the fight took place not only on the dock itself, but also in the water beside the dock. We agree that in considering the type of incident involved, the location of the incident may be relevant. And we agree that on the facts found by the district court, it appears some harm was

done in the water as well as on the dock. That is why we characterize the type of incident at issue as a physical altercation *on and around* a permanent dock surrounded by navigable water.

But we are not convinced by the conclusion Tandon and Doohan seek to draw: that because the incident involved some harm suffered on navigable water, it necessarily had a potential effect on maritime commerce. Not all torts that happen on or over navigable water have the potential to disrupt commercial shipping. Otherwise, there would be no need for the potential effect test at all; we could simply apply the location test in its place. *Cf. Foremost*, 457 U.S. at 675 n.5 (noting that the substantial relationship test is necessary because "[n]ot every accident in navigable waters that might disrupt maritime commerce will support federal admiralty jurisdiction").

Tandon and Doohan speculate that when a fight occurs partly in navigable water, the struggling bodies could themselves pose a navigational hazard. Because the class of incidents we are considering is limited to fights on and around permanent docks, however, we do not worry that the combatants might present an obstacle to commercial navigation in open sea lanes. Unlike the "collision between two pleasure boats in navigable waters" considered in

31

*Foremost*, the type of incident described here could not disrupt commerce by occurring at the mouth of the St. Lawrence Seaway, because there are no permanent docks stationed in the middle of that major shipping route. (If there were, it would be the docks themselves rather than the altercation that would threaten commercial navigation.) We thus think that the scenario Tandon and Doohan pose presents only a fanciful risk to commercial shipping. *See Grubart*, 513 U.S. at 539.

At worst, an incident of this sort might temporarily prevent commercial vessels from mooring at the permanent dock around which the fight occurred. *Cf. Sisson*, 497 U.S. at 362 (noting that a fire on a boat at a marina can "make the marina inaccessible to [commercial] vessels"). But the potential impact of such a temporary disruption is simply too meager to support jurisdiction. The fire considered in *Sisson* might have damaged a marina enough to close it for days or weeks, or even permanently; a fistfight presents no similar danger. At worst, it might prevent commercial ships from using part of a dock for a few hours. We do not think that this slight possibility of a temporary inconvenience is the "potentially disruptive impact on maritime commerce" envisioned by the Supreme Court's test. *Grubart*, 513 U.S. at 538.

32

Alternatively, Tandon and Doohan suggest that a fight on a dock surrounded by navigable water may require emergency responders to come to the dock by boat and leave by boat, potentially snarling naval traffic in nearby waters. We recognize that other courts have found the potentially disruptive impact of a maritime emergency response enough to satisfy the first part of the connection test in some cases. *See, e.g.*, *In re Mission Bay Jet Sports, LLC*, 570 F.3d 1124, 1129 (9th Cir. 2009); *Ayers v. United States*, 277 F.3d 821, 827–28 (6th Cir. 2002); *Sinclair v. Soniform, Inc.*, 935 F.2d 599, 602 (3d Cir. 1991). Those cases, however, have generally dealt with incidents occurring either aboard a vessel or else in open water. *See, e.g.*, *Mission Bay*, 570 F.3d at 1129 (considering "harm by a vessel in navigable waters to a passenger"); *Ayers*, 277 F.3d at 827 (considering "a drowning which occurred a short distance downstream from a lock on navigable waters"). Where such an incident takes place on a vessel or in open water far from the shore, the potential danger to commercial shipping posed by a maritime emergency response may be more significant. *Cf. Roane v. Greenwich Swim Comm.*, 330 F. Supp. 2d 306, 315 (S.D.N.Y. 2004) ("[T]hose on board a boat . . . giving their full attention to the saving of the life of a swimmer in difficulty may well be

33

distracted from hazards posed by the approach of other boats unaware of the rescue in progress, or coming at speed in an effort to assist.").

But the type of incident at issue in this case is a fight on and around a permanent dock, not a fight on a vessel or in open water. The risks to maritime commerce posed by a rescue operation at a dock are substantially lower than the risks to maritime commerce posed by a rescue operation at sea. Emergency responders may have to travel by boat to reach persons injured near a permanent dock, but they will never have to travel far. And once the emergency responders arrive at the scene, they can moor their vessel at the permanent dock, rather than having to focus simultaneously on navigating their vessel and rescuing the injured. An emergency response to an incident on and around a floating dock is consequently much less likely to "ensnarl maritime traffic," *Mission Bay*, 570 F.3d at 1129, than an emergency response to an incident on a vessel or an incident in open water.[8]

---

[8] Tandon and Doohan also cite a number of specific facts about this incident that they claim increased the risk of disruption to maritime commerce. Those facts include, for instance, that the incident occurred on Memorial Day weekend, and that the *Up and Over* allegedly left the South Dock after the incident at a high rate of speed. To the extent their argument rests on specific aspects of the incident that actually occurred, it clearly fails, because our analysis looks only to the general type of incident at issue rather than particular facts about that incident. *See Grubart*, 513 U.S. at 538. To the extent they simply raise these facts to show that this type of incident has a potential disruptive

Indeed, accepting the argument that Tandon and Doohan advance would effectively eviscerate the first part of the connection test. If the possibility of a maritime emergency response is alone enough to show a potential impact on maritime commerce, then almost any tort occurring anywhere on or near navigable water would satisfy this requirement.[9] We do not think this part of the connection test is so easily evaded.

Because the type of incident at issue in this case poses only "a fanciful risk to commercial shipping," *Grubart*, 513 U.S. at 539, it is outside the admiralty and maritime jurisdiction extended by 28 U.S.C. § 1333(1).[10] The district court was therefore correct to dismiss the petition for lack of subject matter jurisdiction.

---

effect on maritime commerce, we remain unconvinced that the potential risk is anything more than fanciful.

[9] Perhaps the requirement might still rule out, for example, a defamation claim, *see Wells v. Liddy*, 186 F.3d 505, 523–27 & n.16 (4th Cir. 1999), or a claim for tortious interference with contract, *see Wiedemann & Fransen, A.P.L.C. v. Hollywood Marine, Inc.*, 811 F.2d 864, 865–66 & n.1 (5th Cir. 1987) (per curiam). We need not consider such questions here.

[10] As this incident does not satisfy the first part of the connection test, we do not reach the second part, and thus need not decide whether the "activity giving rise to the incident shows a substantial relationship to traditional maritime activity." *Grubart*, 513 U.S. at 534 (internal quotation marks omitted).

c.    Coda

In developing the modern test for admiralty tort jurisdiction, the Supreme Court "aimed at keeping a . . . class of odd cases out." *Grubart*, 513 U.S. at 532. It sought to realign the jurisdictional inquiry toward the primary purpose that supports admiralty jurisdiction—namely, "the federal interest in the protection of maritime commerce." *Sisson*, 497 U.S. at 364 n.2. We are quite convinced that this case does not implicate that underlying purpose.

In the eloquent words of Justice Stewart:

> The law of admiralty has evolved over many centuries, designed and molded to handle problems of vessels relegated to ply the waterways of the world, beyond whose shores they cannot go. That law deals with navigational rules—rules that govern the manner and direction those vessels may rightly move upon the waters. . . . Through long experience, the law of the sea knows how to determine whether a particular ship is seaworthy, and it knows the nature of maintenance and cure. It is concerned with maritime liens, the general average, captures and prizes, limitation of liability, cargo damage, and claims for salvage.

*Executive Jet*, 409 U.S. at 269–70. As that description shows, the scope of admiralty law has little or nothing to do with the issues that are likely to appear in cases like this one. On the contrary, state courts have long dealt with similar fistfights under state tort law, without any need for interference from federal courts sitting

36

in admiralty. Given the traditional role of state courts in adjudicating such torts, "[w]e are not inclined at this juncture to disturb the existing precedents and to extend shoreward the reach of the maritime law further than Congress has approved." *Victory Carriers, Inc. v. Law*, 404 U.S. 202, 211 (1971).[11]

## CONCLUSION

For the reasons above, the judgment of the district court is **AFFIRMED**.

---

[11] We recognize that "[a]dmiralty jurisdiction and federal maritime law need not go hand-in-hand." *Blue Whale Corp. v. Grand China Shipping Dev. Co.*, 722 F.3d 488, 497 (2d Cir. 2013). But we remain unwilling to encourage federal courts to take admiralty jurisdiction over cases better heard in state court.